Jonathan Kelly ADAMS,
Plaintiff–Appellee,

v.

FRED WEBER, INC. and Pace
Construction Company,
Defendants–Appellants.

FRED WEBER, INC., Third Party
Plaintiff–Appellee,

v.

PACE CONSTRUCTION COMPANY,
Third Party Defendant–Appellant.

Nos. 87–2420, 87–2421.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 24, 1988.

Decided June 17, 1988.

Rehearing Denied Aug. 31, 1988.

* The Honorable Robert A. Grant, Senior District Judge, Northern District of Indiana, is sitting by designation.

Thomas E. Jones, Walker & Williams P.C., Belleville, Ill., John W. Leskera, Dunham Boman & Leskera, East St. Louis, Ill., for appellants.

Amiel Cueto, Cueto, Daley, Williams, Moore & Cueto, Ltd., Belleville, Ill., for appellee.

Before BAUER, Chief Judge, MANION, and KANNE, Circuit Judges.

BAUER, Chief Judge.

This tort case, brought in diversity,[1] arises out of a motorcycle accident near St. Louis, Missouri. The central issue is causation. Did an unmarked dropoff on a cloverleaf ramp cause the plaintiff-appellee, Kelly Adams, to lose control of his motorcycle and sustain severe injuries? Related questions also arise concerning the defendants' duty to mark the dropoff, the size of the jury's damage award, the conduct of the trial judge and plaintiff's counsel during trial, and the relative liability of each defendant. We affirm the jury's verdict for Adams.

---

1. The plaintiff is a resident of the State of Illinois. Defendants Fred Weber, Inc. and Pace Construction Company both are incorporated and maintain their principal places of business in the State of Missouri.

## I.

### Facts

Kelly Adams worked as a forklift operator at the Anheuser–Busch Brewery in St. Louis, Missouri. On the night of July 13, 1983, he was traveling home to Columbia, Illinois, on his Yamaha motorcycle after completing a 4 p.m. to midnight shift at the Brewery. From work, Adams proceeded on a cloverleaf connector ramp leading from southbound Interstate 55 ("I–55") onto eastbound Interstate 270 ("I–270"). As he left the connector ramp and entered the collector lane merging onto eastbound I–270, he hit a bump and lost control of his motorcycle. Found in a ditch on the north side of the eastbound I–270 collector lane lying among several sections of disassembled guardrail, Adams suffered fractures of his shoulder, distal tibia, pelvis, and lumbar spine, as well as a deep gouge in his left buttock.

Fred Weber, Inc. was the general contractor hired by the State of Missouri to improve ramps at the intersection of I–270 and I–55. Pace Construction Company served as Weber's subcontractor. At the accident location, Pace had laid new asphalt over old asphalt creating a dropoff caused by the change in elevation between the two layers. No warning signs or cautionary devices marked the depression.

## II.

### Discussion

Pace and Weber admit there was a dropoff but dispute its depth (more on that later). They also admit that no cautionary warning devices marked the dropoff, but contend that such devices were not required under Missouri law. They argue, moreover, that Adams never hit the dropoff at all, and therefore, whatever caused him to lose control of his motorcycle (the

**2.** Surprisingly, Busch permits its employees to drink its alcoholic products while at work during break. Adams consumed a beer at lunch and "a beer or two" on his last break one hour before his shift ended at midnight.

**3.** All of the alleged acts of negligence as well as the accident itself occurred in the State of Mis-

defendants charge that Adams was intoxicated[2]) the accident cannot be attributed to any acts or omissions of either defendant. Accordingly, Pace and Weber assign error to the trial court's refusal to direct a verdict in their favor, to grant them a judgment non obstante veredicto (judgment n.o. v.), or, in the alternative, a new trial, and for failing to strike plaintiff's expert testimony that was premised on the assumption that Adams hit the dropoff.

### A. *Standard of Review*

■ Because this is a diversity case, Illinois law is controlling, including its choice-of-law rules. *Twohy v. First Nat. Bank of Chicago*, 758 F.2d 1185, 1189 (7th Cir.1985) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941)). Under those rules, the law of Missouri, the state with the most significant contacts to this action,[3] controls the substantive issue of negligence. *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970). Further application of Illinois's choice-of-law rules, however, dictates that the procedural law of Illinois applies, including its standard of appellate review for both the motion for directed verdict, *Lorance v. Marion Power Shovel Co.*, 520 F.2d 737, 738 (7th Cir.1975), and the motion for judgment n.o.v. *See Crossman v. Trans World Airlines*, 777 F.2d 1271, 1275 (7th Cir.1985) ("Under Illinois conflict of laws principles, the procedural law of the forum state is the proper law to apply.") (citation omitted).[4]

Under Illinois law,

verdicts ought to be directed and judgments n.o.v. entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant

souri. Each of the defendants also are domiciled in Missouri.

**4.** The Illinois Supreme Court has held that procedural law includes "the foundation for [appellate] review" and therefore has applied Illinois's standard of review in diversity cases. *Ogdon v. Gianakos*, 415 Ill. 591, 114 N.E.2d 686 (1953).

that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria and Eastern Railroad Co.*, 37 Ill.2d 494, 229 N.E.2d 504, 513 (1967). Thus, where the substantive issue is negligence "[and] no facts are put forth by the plaintiff to show that the injuries sustained were caused or contributed to by an act or omission of the defendants, a judgment based on such evidence cannot be sustained." *Morton v. F.B.D. Enterprises*, 141 Ill.App.3d 553, 95 Ill.Dec. 903, 907, 490 N.E.2d 995, 999 (5th Dist.1986) (citations omitted). This standard, then, must be applied to the evidence in applying the relevant Missouri law of negligence. So framed, the question is whether the evidence of negligence, as defined by substantive Missouri law, viewed in a light most favorable to the plaintiff, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand.[5]

### B. *Causation*

Under Missouri law, and most other states, a plaintiff pursuing a theory of negligence must show: (1) the existence of a duty owed by the defendant to the plaintiff; (2) the failure of the defendant to fulfill that duty; and (3) an injury to the plaintiff resulting from that failure (causation). *Mac–Fab Products, Inc. v. Bi–State Dev. Agency*, 726 S.W.2d 815, 820 (Mo.App. 1987). To establish causation under Missouri law, the plaintiff need only show that the defendant's conduct was a substantial factor in producing his injuries and not the sole proximate cause. *Morrow v. Grey-*

*hound Lines, Inc.*, 541 F.2d 713, 718 (8th Cir.1976). Causation may be established by circumstantial proof from which a reasonable inference of culpability may be drawn. *Id.; but see Shelton v. Bruner*, 449 S.W.2d 673, 679–80 (Mo.App.1969) ("Evidence that leaves the element of causation in the nebulous twilight of speculation, conjecture and surmise cannot establish negligence.")

There is no direct evidence that Adams traversed the dropoff. He did not see the depression either before or after losing control of his motorcycle, and no one else witnessed the accident. Instead, Adams presented circumstantial proof from which the jury could conclude that he did, in fact, cross over the unmarked dropoff, thereby losing control of his motorcycle. Pace and Weber unsuccessfully set about to persuade the jury that the facts just did not support the plaintiff's position, a contest largely duplicated on appeal.

Pace and Weber argue that Adams's theory of causation is contradicted both by his own testimony and the physical evidence found at the accident scene. The defendants contend that Adams's testimony as to the location of the "bump" cannot be reconciled with the location of the dropoff itself. Missouri State Trooper Layfette Lacey, who examined and constructed a diagram of the accident scene, established that the connector ramp was twenty-eight feet wide, twenty-one feet of which was covered with newly laid asphalt. The remaining seven feet was covered with old asphalt. This created a dropoff due to the disparate

---

**5.** Pace confuses the applicability of Illinois's standard for a judgment n.o.v. with Illinois's substantive law of negligence by arguing that Adams failed to establish causation as defined by several Illinois state court decisions. Much of what Pace relies upon is exemplified by *Monaghan v. DiPaulo Const. Co.*, 140 Ill.App.3d 921, 95 Ill.Dec. 188, 489 N.E.2d 409 (1st Dist.1986), an Illinois case upholding summary judgment for the defendant municipality where the plaintiff motorcycle driver had no memory of the accident or how it occurred, but inferred that he lost control of his vehicle by driving over an unprotected median strip simply because he was seen flying through the air near the strip. The court held that the plaintiff failed to establish proximate cause (cause in fact) under Illinois

negligence law. *Id.*, 95 Ill.Dec. at 190, 489 N.E. 2d at 411. Although factually similar, but clearly distinguishable, Pace appears to argue that *Monaghan* is controlling on the substantive issue of negligence. It is merely instructive at best. Missouri law is controlling on the issue of causation. *See Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593, 596 (1970) (substantive law of state with most significant contacts controls). Pace's reference to other Illinois negligence cases is similarly misplaced. Cases actually applying Illinois's j.n.o.v. standard, however, are instructive, not because they define negligence or causation, but because they add flesh and content to an otherwise amorphous standard. *See, e.g., Morton v. F.B.D. Enterprises*, 141 Ill. App.3d 553, 95 Ill.Dec. 903, 490 N.E.2d 995 (5th Dist.1986).

elevation of each layer of asphalt in the middle of the left side of the ramp.

At trial, Adams testified that he "assumed [h]e was near the center of the lane merging toward the left when [he] hit a severe bump." (R. 223.) Contrary to the defendants' characterization, Adams did not contend unequivocally that the "bump" he traversed was in the center of the ramp. Indeed, in response to the defendants' question, "Mr. Adams, as you sit here today, I take it you still believe you were in the middle of the pavement at the time you lost control of your motorcycle?" Adams replied, "I believe I was in a safe position. I was merging to the left, I probably started in the middle and merged to the left, yes, sir. That's the normal route." (R. 259.) Adams's testimony is, in fact, consistent with the actual location of the dropoff. He testified that the bump he struck was left of center, exactly where Officer Lacey placed the dropoff created by the defendants' repaving.

Next, the defendants argue that the location of a forty-six foot skid mark, presumably left by Adams's motorcycle, belies the fact that he traversed the dropoff. Adams and the defendants, however, do not agree on the location of the skid mark. Adams maintains that the skid mark originated at the dropoff where a "V" is formed by the merger of the connector ramp with the collector lane, thus providing circumstantial proof that he hit the dropoff. (Appellee's brief at 5.) The defendants, however, charge that Adams's brief mischaracterizes Officer Lacey's testimony as to the location of the skid mark which they argue was some distance from the dropoff itself. (Pace's reply brief at 4.) The record is muddled on this point at best.

Several references to a "V" depicted in a photograph of the scene are contained in the record. (Plaintiff's Exhibit 1B.) At one point, Officer Lacey indicates that the skid mark originated from an "area in between ... two white lines." (R. 91.) Plaintiff's counsel then asks, "Across this V here, is that correct?" Reply, "That's correct." (R. 91.) The "V" referred to by plaintiff's counsel appears to be the inter-

section of two white lines painted on the pavement after the accident but reflected in a photograph used at trial. Later plaintiff's counsel, again using the "V" as a reference point, asked Officer Lacey to identify a mark he had placed on the photograph asking, "Up here in this V where you marked this, is that where one of the lips [dropoff] that you described was?" Answer, "The reason I made that mark was because on this portion of the ramp, as I indicated earlier, this is where the new asphalt stopped and the old asphalt began...." (R. 92.) Finally, plaintiff's counsel asked, "From your investigation, the skidmark originated in that V which you described earlier, is that correct, sir?" Answer, "It tended to indicate so, yes." (R. 98.)

From the dry record alone, our ability to assess the precise location of the skid mark relative to the dropoff is limited. Incredibly, Officer Lacey was never asked directly the distance or relationship of the skid mark to the dropoff. We are left only to follow the circuitous contours of disjointed testimony. Based on our review of Officer Lacey's testimony, however, there is evidence in the record from which the jury could conclude that the skid mark originated at or near the dropoff, thus supporting its verdict against the defendants. Officer Lacey placed the skid mark at the intersection of the two white lines that formed a "V." Later, in response to plaintiff's question, Lacey indicated that he made a mark in that "V" to indicate the location where the "new asphalt stopped and the old asphalt began." (R. 92.) Officer Lacey's testimony indicates that the skidmark originated at or near the dropoff. Moreover, the jury had the benefit of viewing the photograph while observing Officer Lacey point to the location of the dropoff as well as the skid mark.

Regardless of the location of the skid mark, however, the defendants contend that its very existence contradicts Adams's testimony and belies the fact that the dropoff caused his accident. Alternatively, they contend that the skid mark was not left by Adams's motorcycle and therefore cannot support an inference that he lost

control of his vehicle at the dropoff. In fact, however, the defendants make no serious attempt to show that the skid mark was not formed by Adams's motorcycle. Indeed, such a contention, if accepted, could only bolster Adams's version of the accident. For the existence of the skid mark is the most troubling aspect of this circumstantial case. As the defendants maintain, the skid mark might suggest that Adams was mounted on his motorcycle applying his brakes long after passing by the dropoff. Adams, however, testified that he lost control of his motorcycle and went down within an instant after hitting the bump (R. 259–260), and that he had no recollection of applying his brakes before leaving the roadway. (R. 256.) The defendants argue that if the existence of the skid mark demonstrates that Adams's description of the accident is inaccurate, then the jury's verdict could be based on nothing more than unsubstantiated conjecture. Unfortunately, Adams fails even to mention this apparent incongruity much less resolve it.

■ Nevertheless, we cannot conclude that all of the evidence viewed in a light most favorable to Adams so overwhelmingly favors the defendants that no contrary verdict based on the evidence could ever stand. *See Pedrick*, 229 N.E.2d at 513. Contrary to the defendants' assertion, the basis for a finding of causation does not depend solely on a substantiation of Adams's testimony that once striking the bump he fell in an instant, or whether he did or did not apply his brakes. Indeed, Adams's testimony that he struck a bump at the location of the dropoff along with Officer Lacey's identification of the dropoff as the only depression on the ramp and the origin of a skid mark at that same spot all support a finding of causation.

Moreover, Adams's testimony can be reconciled with the existence of the skid mark. Although Adams had no recollection of applying his brakes, he indicated that his motorcycle began skidding after he struck the bump, thus allowing the jury to conclude reasonably that the skid mark was caused by the skidding of Adams's motorcycle itself. Nor is the length of the skid mark incompatible with Adams's assertion that he fell in an "instant." John Glennon, a highway safety engineer called by Adams, testified that Adams would have traveled approximately fifty-two feet per second if going thirty-five miles per hour. Therefore, if the jury believed that an "instant" as expressed by Adams was a second or more, it was fully capable of reconciling Adams's version of the accident with the existence and length of the skid mark.

The law of Illinois, like so many others, does not regard lightly the findings of a jury. Thus, only where little or no evidence supports a plaintiff's claim may a verdict be directed or set aside. *See Cokinis v. Maywood–Proviso State Bank*, 81 Ill.App.3d 1057, 36 Ill.Dec. 939, 401 N.E.2d 1077 (1st Dist.1980). Moreover, under Illinois law,

> [w]here a substantial factual dispute is presented by the evidence and where an assessment of the credibility of witnesses and an election between conflicting evidence may be decisive, it is erroneous to direct a verdict.

*Id.* The nature of the defendants' argument is simply an attack on Adams's credibility and an assessment of competing evidence regarding the location of the dropoff and skid mark. This is not a case like *Monaghan v. DiPaulo Const. Co., et al.*, 140 Ill.App.3d 921, 95 Ill.Dec. 188, 489 N.E.2d 409 (1st Dist.1986), where the plaintiff attempted to infer that he struck a median strip with no more evidence than proof that he was seen flying through the air near the strip,[6] or *Morton v. F.B.D. Enterprises*, 141 Ill.App.3d 553, 95 Ill.Dec. 903, 490 N.E.2d 995, 1000 (5th Dist.1986), where the jury's verdict was set aside on appeal because the only evidence of the defendant's conduct was unrelated to the acts of negligence charged in the complaint and jury instructions. Here Adams presented ample circumstantial evidence, which, if credited by the jury, fully supports a finding of

**6.** *See supra* note 5.

causation.[7] Unlike the defendants in *Monaghan* and *Morton*, Pace and Weber do not assail the sufficiency of Adams's circumstantial evidence as much as the validity of it. As our earlier discussion indicates, we are not impressed by the defendants' assessment of the facts and will not disturb the jury's verdict.[8]

## C. Duty to Warn

Next, the defendants argue that they had no duty to mark the dropoff with cautionary devices because the evidence failed to establish that the dropoff was of sufficient depth to require such warnings under Missouri law. The State of Missouri requires that warning devices mark any depression that exceeds two inches in depth. Once again, the defendants ask us to set aside the jury's determination as to the actual depth of the dropoff. The same standards for a judgment n.o.v. and for a new trial discussed earlier are applicable here.

■ Apparently, Officer Lacey was the only witness who examined the actual dropoff and made an estimate of its depth. He stated that the dropoff was approximately two or three inches. Upon further questioning, he answered affirmatively plaintiff's question, "Not an inch and a quarter or an inch and three quarters. Two inches was your low estimate?" Although Pace introduced evidence that the asphalt laying machine used for the repaving was set to lay only one and one-quarter inches, the Pace employee who actually laid the asphalt testified that he did not know what depth was laid by the machine, and other witnesses involved in the construction admitted that the depth could have been more than three inches.

Faced with Officer Lacey's direct observation of the dropoff and the equivocal evidence presented by the defendants, we can find neither that the evidence so overwhelmingly favors movant that no contrary verdict could ever stand, nor that the trial judge abused his discretion in finding that the jury's verdict was not contrary to the weight of the evidence.[9]

---

**7.** The defendants also complain that jury instruction number 13 was improperly tendered to the jury because it was not supported by any evidence. *See E.I. DuPont DeNemours v. Berkley & Co., Inc.,* 620 F.2d 1247, 1258 (8th Cir. 1980). The instruction set forth in this case contained six bases for finding the defendants guilty of negligence, including the failure to provide adequate lighting. The defendants maintain, however, that they could not be charged with a duty to provide adequate lighting because the evidence established that the State of Missouri, which, rather strangely, turned off the overhead lights automatically at midnight, controlled the relevant lighting. But that cannot excuse the defendants from the duty of providing lighting independent of the state or, at the very least, requesting that the state leave the overhead lights on during the repaving operations. The jury was entitled to conclude that the defendants were required to assure the existence of adequate lighting once having created a dangerous condition. Moreover, contrary to the defendants' contentions, the evidence does not preclude a finding that insufficient lighting was a proximate cause of Adams's accident. Although Adams indicated that his motorcycle headlight provided enough light to see where he was going, he also indicated that he was unable to see any defects in the pavement or the dropoff itself, when, by the light of day, Officer Lacey readily identified and made note of the dropoff. Moreover, Officer Lacey indicated that it was improbable that the dropoff could be identified without adequate lighting.

**8.** Nor are we convinced that the defendants are entitled to a new trial. As we noted in *Simplex, Inc. v. Diversified Energy Systems, Inc.,* 847 F.2d 1290, 1294–1295 (7th Cir.1988), this inquiry differs from the standard for a judgment n.o.v. in degree only. *See also Cygnar v. City of Chicago,* 652 F.Supp. 287, 290–291 (N.D.Ill.1986). Based on our review of the evidence, we cannot conclude that the trial judge abused his discretion, *Etling v. Sander,* 447 F.2d 593, 594 (7th Cir. 1971), in concluding that the verdict was not contrary to the weight of the evidence. *General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc.,* 695 F.2d 281, 288 (7th Cir.1982).

**9.** Further still, Pace urges us to reverse the jury's verdict because its substantial rights were affected, *see Oberst v. Intern. Harvester Co., Inc.,* 640 F.2d 863, 866 n. 4 (7th Cir.1980), by the trial judge's allegedly improper characterization of the dropoff as a "defect." Because the depth of the dropoff was the key to establishing the defendants' duty to warn, Pace argues that Judge Beatty's comment substantially affected its right to have the jury determine the nature of the dropoff. Pace's contention is absurd. An examination of the trial transcript reveals that it was Pace's own attorney who first interjected the term "defect." Judge Beatty merely repeated that term while attempting to resolve a semanti-

### D. *Damages Award*

 The jury returned a verdict for the plaintiff in the amount of $1,280,-000.00,[10] apportioning 60% fault to Weber and 40% to Pace. Pace argues that the verdict is excessive and that Judge Beatty abused his discretion by allowing it to stand. *Etling v. Sander,* 447 F.2d 593, 594 (7th Cir.1971). Predictably, Weber challenges the jury's apportionment of fault. Neither contention warrants more than a cursory examination.

Pace's challenge to the jury's award, for example, is confined to an evaluation of Adams's lost earnings and ignores completely the jury's attempt to compensate Adams for his considerable pain and suffering. *Cf. Henry v. St. John's Hospital,* 159 Ill.App.3d 725, 111 Ill.Dec. 503, 512 N.E.2d 1044, 1055 (4th Dist.1987), *appeal denied* 118 Ill.2d 543, 117 Ill.Dec. 225, 520 N.E.2d 386 (1988). One could hardly consider the jury's award "monstrously excessive" in light of his extensive injuries and permanent disability.[11] *See Levka v. City of Chicago,* 748 F.2d 421, 424–425 (7th Cir.1984) (the jury's calculation of damages award cannot be set aside unless it is "monstrously excessive [or] so large as to shock the conscience of the court....").

Weber asserts that as the passive, though primary, contractor with the State of Missouri, no reasonable verdict based on the evidence could be reached finding it more liable than Pace, which did the actual repaving work. What Weber ignores, however, is that the theory of negligence was based on omissions and not positive acts. Thus, it was not the creation of the dropoff that constituted negligence, but rather the failure to warn properly of its existence. As part of its contract with Weber, the State of Missouri agreed to, and provided funds for, the purchase of highway warning barrels. Despite the fact that Weber's contract specifically contemplated the use of cautionary devices, Weber failed to pro-

cure, much less employ or offer, for use by Pace, any such items. Given the theory of negligence, the jury's assessment of relative liability was supported by the evidence.

### E. *Breach of Contract*

Apart from any question of negligence, Weber filed a third-party complaint against Pace for breach of its subcontract that obligated Pace to procure liability insurance and name Weber as an additional insured on its policy. Although Pace obtained insurance for itself, it failed to include Weber as an additional insured. Judge Beatty concluded that Pace breached its contract and awarded Weber $300,000 in damages. The court arrived at this sum by multiplying the percentage of fault attributed to Weber (60%) in the primary action by the limits of Pace's primary policy ($500,000). As additional damages, the court awarded Weber $52,147.22 in attorneys fees and costs expended in defending Adams's suit.

Pace appeals from Judge Beatty's decision, contending that the language of the subcontract requiring Pace to name Weber as an additional insured is vague and unenforceable. Pace argues that the contract does not clearly and unequivocally require it to obtain insurance against Weber's own acts of negligence and, thus, cannot render Pace liable for any damages attributed by the jury to Weber's own acts of negligence. The last sentence in paragraph three of the contract states:

> Subcontractor (Pace) agrees that the insurance to be carried hereunder will include Prime Contractor (Weber) as the named insured, and such insurance will not be cancelled, except on ten (10) days prior written notice to the Prime Contractor.

(P. 3. Paragraph 3 of Defendant's Ex. No. 3, Pace's Appendix p. 25.) The substantive law of Missouri is again controlling. *See*

---

cal squabble that had broken out between the trial attorneys regarding Officer Lacey's previous testimony.

**10.** The award was offset by a 10% reduction for Adams's comparative fault.

**11.** In addition to losing his job at Anheuser-Busch as a result of his disability, Adams was rendered sexually impotent, unable to control his bladder, suffers from constant pain, and his right leg was shortened due to his broken hip.

*Dreis & Krump Mfg. Co. v. Phoenix Ins. Co.*, 548 F.2d 681 (7th Cir.1977). While we are not bound by Judge Beatty's construction of the subcontract, as it rests on conclusions of law, *see Chandler v. United States*, 226 F.2d 403 (7th Cir.1955), we nevertheless believe his decision to be correct.

Although it is well established under the common law of Missouri that contracts of indemnification are unenforceable in the absence of a "clear and unequivocal" expression of intent to hold another harmless for her own acts of negligence, *see Salts v. Bridgeport Marina, Inc.*, 535 F.Supp. 1038, 1039 (W.D.Mo.1982); *Kansas City Power & Light Co. v. Federal Const. Corp.*, 351 S.W.2d 741, 745 (Mo.1961), we can find no Missouri cases imposing a similar requirement for contracts to procure insurance against such acts of negligence. In the absence of controlling authority, we must predict how the Missouri Supreme Court would resolve this case. *See Collins Co., Ltd. v. Carboline Co.*, 837 F.2d 299, 301 (7th Cir.1988) (federal court sitting in diversity must predict how the state supreme court would decide the case, admitting, however, that federal courts sometimes make incorrect predictions). The only relevant authority cited by either party or discovered by our research indicates that the Missouri Supreme Court would distinguish between contracts to indemnify and those to procure insurance and enforce the latter, even in the absence of clear and unequivocal language to procure insurance against a party's own negligence. *See Monsanto Chemical Co. v. American Bitumuls Co.*, 249 S.W.2d 428 (Mo.1952).

In *Monsanto*, a co-defendant, Cal–Spray, took delivery of certain chemicals owned by Monsanto for the purpose of manufacturing a liquid weed killer. Pursuant to their contract, "Monsanto agree[d] to carry adequate insurance to cover all stocks and materials held by Cal–Spray for Monsanto's account." *Id.* at 430. A fire subsequently destroyed the stock and Monsanto collected the insurance proceeds from its policy. Monsanto, however, sued Cal–Spray for the negligent destruction of its property claiming, as Pace does here, that its contract to purchase insurance could not be construed as an indemnification agreement against Cal–Spray's own negligence. Distinguishing between a contract to indemnify and one to procure insurance for the benefit of another, *id.* at 431, the Missouri Supreme Court held that Monsanto was required to provide insurance for the benefit of both parties, regardless of whose negligence caused the loss. The court concluded that "the stipulation ... to carry adequate insurance must have been for the benefit of both of the parties to the agreement; otherwise, there would have been no occasion for the stipulation." *Id.* at 431.

Like Monsanto, Pace contends that its contract to purchase an insurance policy naming Weber as an additional insured cannot be construed as an indemnification agreement because the contract does not unambiguously relieve Weber of liability for its own acts of negligence. *See Salts*, 535 F.Supp. at 1039. As in *Monsanto*, however, Pace's obligation was not to indemnify Weber, but merely to procure insurance for its benefit. The Missouri court held that such an obligation necessarily covered Cal–Spray's own negligence, even in the absence of specific language to that effect. *Monsanto*, 249 S.W.2d at 430–31. Thus the law of Missouri does not render Weber's contractual right unenforceable as Pace now contends. Indeed, it supports the imposition of damages against Pace for the breach of its contractual obligation (or so we predict the Missouri Supreme Court would conclude in this case). *See Collins Co., Ltd.*, 837 F.2d at 302.

Nor are we convinced that public policy concerns would move the Missouri Supreme Court to allow Pace to profit from its contractual breach by receiving "credit" toward its liabilities from monies paid through Weber's independent insurance policy.[12] Once again, the law of Missouri stands between Pace and its avowed asser-

---

12. Independent from the insurance coverage bargained for with Pace, Weber obtained insurance through the Wausau Insurance Company in the amount of $500,000. Both of the policies procured by Pace and Weber contained "other insurance" provisions.

tion. In *Monsanto*, the court rejected the plaintiff's argument that, by failing to name or otherwise inform its insurer of Cal–Spray's right to coverage, it, or its insurer as subrogee, was free to proceed against Cal–Spray for its acts of negligence. The court stated that

> [i]f Monsanto became obligated by the contract … to insure for the mutual benefit of both the parties to the contract and did not do so, neither Monsanto nor [its insurer as subrogee] may have the advantage of Monsanto's breach of its contractual obligation to Cal–Spray.

*Id.* at 431. Thus, the court concluded that Monsanto was obligated to the terms of its agreement with Cal–Spray regardless of its failure to obtain insurance on Cal–Spray's behalf. Pace similarly is confined by its contractual arrangement with Weber.

The judgment of the district court is

AFFIRMED.