**TYRO INDUSTRIES, INC.**

v.

**TREVOSE CONSTRUCTION CO., INC.**

**Civ. A. No. 89–1769.**

United States District Court,
E.D. Pennsylvania.

April 5, 1990.

Mark F. Brancato, King of Prussia, Pa., for plaintiff.

Virginia H. Miller, Philadelphia, Pa., for defendant.

## MEMORANDUM

HUYETT, District Judge.

This action arises out of a construction sub-subcontract between Trevose Construction Co., Inc. ("Trevose") and Tyro Industries, Inc. ("Tyro") for work on a state-sponsored highway construction project in Northhampton County, Pennsylvania. Tyro sued Trevose alleging breach of contract for improperly terminating the contract. Trevose filed a counterclaim against Tyro alleging breach of contract for failing to maintain its general liability insurance. The parties filed cross-motions for summary judgment. The ultimate issue posed by these motions is the propriety of Trevose's termination of its contract with Tyro.

I write this memorandum to state my reasons for denying Tyro's motion for summary judgment and granting Trevose's motion for summary judgment, pursuant to my order dated March 30, 1990.

## I. FACTS [1]

In June 1986, the Commonwealth of Pennsylvania, Department of Transportation ("PennDOT") entered into a contract with James D. Morrissey Inc. ("Morrissey"), pursuant to which Morrissey became the general contractor on a project for the construction of Interstate 78 in Northhampton County, Pennsylvania. Subsequently, Morrissey entered into a subcontract with Trevose.

On August 8, 1986, Trevose entered into a sub-subcontract [hereinafter "the contract"] with Tyro, a "Disadvantaged Business Enterprise" ("DBE") contractor.[2] Under the terms of the contract, Tyro was to construct two reinforced earth walls on two separate portions of Interstate 78.[3]

---

1. In order to simplify references to the record, each memorandum filed by the parties will be referred to by the paper number under which it was docketed by the Clerk of the Court. Below is a list of the various memoranda and their corresponding paper numbers, arranged in chronological order under their respective cross-motion for summary judgment:

a. Tyro's Motion for Summary Judgment
(1) Memorandum in Support of Plaintiff Tyro Industries, Inc.'s Motion for Summary Judgment.................. Paper 13
(2) Trevose Construction Co., Inc.'s Memorandum in Opposition to Tyro Industries, Inc.'s Cross-Motion for Summary Judgment ........ Paper 17
(3) Supplemental Memorandum of Law in Support of Motion for Summary Judgment by Tyro Industries, Inc. ....................... Paper 34

b. Trevose's Motion for Summary Judgment
(1) Trevose Construction Co., Inc.'s Memorandum of Law in Support of Cross-Motion for Summary Judgment .... Paper 14
(2) Tyro Industries, Inc.'s Memorandum of Law in Opposition to Trevose Construction Company, Inc.'s Cross-Motion for Summary Judgment ..................... Paper 18

(3) Trevose Construction Co., Inc.'s Reply Memorandum in Support of Cross-Motion for Summary Judgment .... Paper 20
(4) Trevose Construction Co., Inc.'s Supplemental Memorandum in Support of Cross-Motion for Summary Judgment.................. Paper 29
(5) Response by Plaintiff, Tyro Industries, Inc., to Trevose Construction Company, Inc.'s Supplemental Memorandum in Support of Cross-Motion for Summary Judgment.................. Paper 32
(6) Trevose Construction Co., Inc.'s Second Supplemental Memorandum in Support of Cross-Motion for Summary Judgment............ Paper 35

2. PennDOT adopts the definition of a DBE as defined in Title 49 of the Code of Federal Regulations, Part 23. *See* Paper 13, Exhibit D, at 121.

Under PennDOT's DBE Utilization Affirmative Action Requirements, PennDOT established the goal of awarding 10% of the contract price to firms owned and controlled by disadvantaged and 2% of the contract price to firms owned and controlled by women. *See id.*

3. The contract between Trevose and Tyro refers to a "contractor" and a "subcontractor," rather

Section 9 of the contract, entitled "Insurance," provides in relevant part that

The Subcontractor shall provide and maintain Workmen's Compensation and Employer's Liability Insurance for the protection of his employees, as required by law of an employer. The Subcontractor shall also provide and *maintain in full force and effect during the term of this Subcontract insurance* ... in a company satisfactory to the Contractor, protecting the Subcontractor, the Owner [PennDOT] and the Contractor against liability from damages because of injuries, including death, suffered by persons other than employees of the Subcontractor and liability from damages to property, arising from and growing out of the Subcontractor's operations in connection with the performance of this Subcontract.

*See* Paper 14, Exhibit B, at 4, Section 9(a) (emphasis added).

Subsection b of Section 9 provides in relevant part that

Written proof satisfactory to the Contractor of compliance with the requirements of this section shall be furnished to the Contractor before any work is performed under this Subcontract. Such proof of insurance shall provide for 10 days written notice to the Contractor prior to the cancellation or modification of any insurance referred to therein.

*See id.* at 4, Section 9(b).

In September 1986, Tyro provided Trevose with Certificates of Insurance, evidencing compliance with Section 9 of the contract. *See* Paper 14, Exhibit C. Tyro obtained its general liability insurance policy through an insurance agency by the name of James A. Wood, Inc. ("James A. Wood agency"). The insurance carrier affording Tyro coverage was Great American Insurance Company ("Great American"). Tyro financed the premiums for this insurance policy through AFCO Credit Corpora-

tion ("AFCO"), a premium financing company. *See* Paper 13, Exhibit T. The finance agreement between Tyro and AFCO provided that "[t]he insured irrevocably appoints AFCO its Attorney--In--Fact with full authority to cancel the insurance policies." *See id.* at 3, ¶ 10. The finance agreement also provided that "AFCO may cancel the insurance policies ... if ... [t]he insured does not pay any installment according to the terms of this Agreement." *See id.* at 3, ¶ 9.

On October 28, 1986, Ralph Dunlap, the PennDOT project manager, handed Robert Ramsay, the president of Tyro, a handwritten memo in the presence of Glenn Schwartz, the project engineer for Trevose. *See* Paper 13, Affidavit of Robert B. Ramsay, at ¶ 25. The memo from Mr. Dunlap to Tyro stated that, because of the cancellation of Tyro's general liability insurance policy, Tyro was no longer permitted to work on the project as of noon on October 28, 1986.[4] *See* Paper 14, Exhibit I. Mr. Dunlap also gave Mr. Schwartz a copy of this memo.

Later that same day, October 28, 1986, Glen Schwartz from Trevose called Tyro's insurance agency, James A. Wood, to inquire into whether Tyro's general liability insurance had in fact been cancelled. Charles M. Wheeler, from the James A. Wood agency, informed Mr. Schwartz that, effective October 14, 1986, Tyro's insurance had been cancelled by AFCO because of nonpayment of premiums. *See* Paper 29, Exhibit A, at 32–33. Mr. Wheeler sent Mr. Schwartz a letter dated October 28, 1986 summarizing their telephone conversation, as well as a copy of the Notice of Cancellation which had been sent by AFCO to the James A. Wood agency. *See id.* at 31–32; Paper 14, Exhibit H.

Mr. Schwartz reported to Francis A. Canuso, Sr., the president of Trevose, that Tyro's general liability insurance had been

---

than a "subcontractor" and a "sub-subcontractor." Therefore, for the sake of clarity and in keeping with the language of the contract at issue, Trevose will be referred to as "the contractor" and Tyro will be referred to as "the subcontractor."

**4.** The record does not reveal how PennDOT found out that Tyro's general liability insurance policy had been cancelled.

cancelled. *See* Paper 35, Exhibit C, at 27. Mr. Canuso proceeded to investigate the matter. On October 29, 1986, Mr. Canuso called Mr. Wheeler, from the James A. Wood agency, to discuss the status of Tyro's general liability insurance. *See id.* at 27; Paper 35, Exhibit E. Mr. Wheeler informed Mr. Canuso that Tyro's liability insurance policy had been cancelled by AFCO effective October 14, 1986 and that Great American would be sending out notices. *See* Paper 14, Exhibit J; Paper 35, Exhibit D at 37–40; Paper 35, Exhibit E. Mr. Canuso also inquired as to why Trevose had not received the ten-day advance notice as required by the contract and the Certificate of Insurance. Mr. Wheeler advised Mr. Canuso that it was the responsibility of AFCO and Great American to send out that notice. *See* Paper 14, Exhibit J.

Upon completing his telephone call to Mr. Wheeler, Mr. Canuso spoke to Mr. Ramsay, President of Tyro, and informed Mr. Ramsay of his telephone conversation with Mr. Wheeler. Mr. Ramsay insisted that, according to Great American, his insurance policy was still in effect and suggested that Mr. Canuso contact Great American for verification. *See* Paper 13, Affidavit of Robert B. Ramsay, at ¶ 39. Acting on this suggestion, on October 30, 1986, Mr. Canuso spoke to Shirley Cyr at Great American who confirmed that Tyro's policy had been cancelled effective October 14, 1986. *See* Paper 17, Exhibit A, at ¶¶ 3 & 4; Paper 35, Exhibit C, at 28–29 & 56.

Mr. Canuso even requested his own insurance agent to investigate the matter to ensure that the information received concerning the status of Tyro's liability insurance was accurate. *See* Paper 35, Exhibit C, at 29. His insurance agent confirmed all of Canuso's earlier findings—Tyro's general liability insurance policy had been cancelled effective October 14, 1986. *Id.*

On October 29, 1986, Mr. Canuso advised Mr. Ramsay that Trevose was terminating its contract with Tyro because of Tyro's failure to maintain its general liability insurance coverage. After this conversation with Mr. Ramsay, Mr. Canuso drafted a memo to the file summarizing the conversation. *See* Paper 14, Exhibit J. Among the reasons cited in this memo for termination of the contract were the cancellation of Tyro's general liability insurance, bad checks to vendors and personnel, bad relations with the Union, poor workmanship, and scheduling delays. *See id.*

On November 3, 1986, Great American sent a notice to Tyro confirming the cancellation of its insurance effective October 14, 1986. *See* Paper 14, Exhibit L. A copy of this notice was sent to Trevose. Also on November 3, 1986, Francis A. Canuso, Jr. of Trevose sent a letter to Tyro confirming the oral termination of their contract on October 29, 1986. *See* Paper 14, Exhibit M.

Tyro did not perform any work on the project after it received the handwritten memo from Mr. Dunlap, the PennDOT project manager, on October 28, 1986.[5] Trevose, however, continued work on the reinforced earth walls by assuming the management, direction, and control of Tyro's personnel, equipment, and materials. *See* Paper 13, Affidavit of Robert B. Ramsay, at ¶¶ 36 & 41. On November 3, 1986, Trevose entered into a sub-subcontract with Broken Lance Enterprises, another DBE contractor, for the completion of the work which had been covered by the Tyro/Trevose sub-subcontract. *See id.* at ¶ 43; Paper 14, Exhibit A, at ¶ 20; Paper 14, Exhibit K.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Small v.*

---

5. On November 4, 1986, Ralph Dunlap from PennDOT issued another memo to Tyro rescinding the memo of October 28, 1986, stating that Tyro was permitted to work on the project and that PennDOT did not consider Tyro in noncompliance of any obligation owed to PennDOT. *See* Paper 14, Exhibit N. Apparently, Mr. Dunlap was informed after he had issued the first memo that PennDOT did not have the authority to prohibit a subcontractor from working at a project site because of the subcontractor's failure to maintain its general liability insurance. *See* Paper 13, Affidavit of Robert B. Ramsay, at ¶¶ 33 & 35.

*Seldows Stationery,* 617 F.2d 992, 994 (3d Cir.1980). The court does not resolve questions of disputed fact, but simply decides whether there is a genuine issue of fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The facts must be viewed in the light most favorable to the non-moving party, and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party.

In the present case, both parties agree that the relevant facts are *not* in dispute and, therefore, that it is appropriate to determine the liability phase of this action by way of summary judgment.[6]

## III. DISCUSSION

In its motion for summary judgment, Tyro contends that Trevose's termination of the contract on October 29, 1986 was improper for two reasons.[7] First, Tyro argues that, under the contract, Trevose was required to give Tyro written notice of any default and at least five working days to cure that default. Second, Tyro argues that, on October 29, 1986, its liability insurance policy was in full force and effect, and, therefore, that Trevose had no right to terminate the contract.

On the other hand, Trevose contends in its cross-motion for summary judgment that its termination of the contract on October 29, 1986 was proper because Tyro had materially breached Section 9 of the contract by failing to maintain its general liability insurance.

Examining these two motions for summary judgment together, there are three issues which must be decided:

(1) whether the contract required Trevose to provide Tyro with written notice and a reasonable opportunity to cure a

default relating to failure to maintain liability insurance;

(2) whether Tyro was in breach of the contract on October 29, 1986 for failing to maintain its general liability insurance; and

(3) whether failure to maintain liability insurance as required by the contract was a material breach.

I will discuss these issues seriatim.

### A. Written Notice and Time to Cure

■ Tyro contends that the terms of the contract required Trevose to give Tyro written notice of any alleged default and at least five working days to cure that alleged default. Therefore, Tyro reasons that, since Trevose failed to give Tyro any notice or time to cure, Trevose did not have the right to terminate the contract on October 29, 1986.

In support of its contention that the terms of the contract required written notice and time to cure with respect to any default, Tyro looks to Sections 1 and 5(b) of the contract. Section 1 incorporates by reference PennDOT's DBE Affirmative Action Requirements. One of PennDOT's DBE requirements obligates the contractor to "take all necessary and reasonable steps ... to ensure that DBEs have the maximum opportunity to compete for and perform contracts." *See* Paper 13, Exhibit D, at 121–22. Tyro argues that the obligation to provide maximum opportunity to perform necessarily incorporates an obligation to provide a reasonable opportunity to cure any contractual default.

Section 5(b) provides in relevant part: In the event the Subcontractor fails to comply or becomes disabled from complying with the provisions herein *as to character or time of performance,* and the failure is not corrected within five working days after written request by the

---

6. On March 15, 1990, a status conference was held in chambers at which time the parties were given an opportunity to argue the merits of their respective summary judgment motions. At that conference, the parties agreed that there were no genuine issues of material fact and that it was proper to grant summary judgment.

7. Tyro also briefed the issue of whether it is entitled to payment for the full amount of the contract price for "mobilization." *See* Paper 13. Because this issue is relevant to damages and not liability, I shall defer its decision until the next stage of this action—the calculation of damages.

Contractor to the Subcontractor, the Contractor ... may without prejudice to any other right or remedy, take over and complete the performance of this Subcontract at the expense of the Subcontractor....

*See* Paper 14, Exhibit B, at 3 (emphasis added). Tyro argues that the requirement in Section 5(b) of written notice and time to cure also applies to defaults pertaining to the insurance requirements under Section 9.

Trevose disputes these contentions. Trevose asserts that the requirement in Section 5(b) for written notice and time to cure only applies to provisions relating to character or time of performance. Trevose also asserts that the phrase "the provisions herein as to character or time of performance" refers to the provisions contained in the immediately preceding paragraph, Section 5(a). Therefore, Trevose reasons that it did *not* need to provide Tyro with written notice and time to cure because maintaining insurance as required in Section 9 has nothing to do with the character or time of Tyro's performance.

I conclude that Tyro's contentions are without merit. It strains reason to argue that Section 5(b) applies to any default under the contract or that the provision requiring maintenance of liability insurance is a provision which relates to character or time of performance. The clear language of the contract provides that the notice and time to cure requirements of Section 5(b) apply only to defaults that relate to the Subcontractor's failure to comply with the provisions as to character or time of performance. Looking at the structure of the contract, it is also clear that the phrase "provisions herein as to character or time of performance" relates to the provisions contained in the immediately preceding paragraph, Section 5(a).

■ Further, I conclude that the phrase "provisions ... as to character or time of performance" is clear and unambiguous. Therefore, I can interpret the terms in that phrase as a matter of law, according to their plain meaning. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 n. 10 (3d Cir.1980). "Performance" refers to carrying out or doing the subject matter of the contract, in this case the construction of two reinforced earth walls. "Character" refers to the manner in which the subcontractor performs and the quality of the subcontractor's performance. "Time" refers to when the subcontractor performs or when the subcontractor's performance is completed.

Clearly, the requirements to obtain and maintain certain types of insurance are *not* provisions which relate to the character or time of performance. First, the requirement to obtain insurance and present insurance certificates evidencing compliance with Section 9 is a condition precedent which must be satisfied before any work is performed under the contract. Second, the requirement to maintain liability insurance coverage during the term of the contract is a contractual obligation which is collateral, yet essential, to the subcontractor's performance of the subject matter of the contract. Section 9 provides that, without the required insurance coverage, the subcontract cannot perform work under the contract. Therefore, I conclude that the requirement contained in Section 5(b) of written notice and the opportunity of five working days to cure does *not* apply to defaults as the result of failing to maintain liability insurance as required under Section 9.

■ Tyro's contention that PennDOT's DBE requirements, incorporated in Section 1 by reference, necessarily imply an obligation to provide a DBE with a reasonable opportunity to cure *any* default is equally without merit. First, the PennDOT DBE Review Committee for Good Faith Efforts reviewed Trevose's actions with respect to Tyro and concluded that Trevose's termination of the contract did *not* violate the PennDot DBE requirement to provide DBEs with maximum opportunity to compete for and perform contracts. *See* Paper 17, Exhibit A, at ¶ 6; Paper 13, Exhibit D, at 121–22. I must give deference to this committee's conclusion that Trevose did *not* fail to exert a reasonable good faith effort to meet PennDOT's established DBE goals. Second, I do *not* construe the obli-

gation to provide a DBE with maximum opportunity to perform as implying a further obligation to provide a DBE with a reasonable opportunity to cure each and every default. The DBE requirements must be interpreted in conjunction with the rest of the contract at issue. In the present case, Tyro contractually assumed the obligation to obtain and maintain certain insurance coverage during the term of the contract. These insurance requirements were mandatory prerequisites to commencing and continuing performance under the contract.

In addition to my interpretation of the contract at issue, there are practical reasons why a contractor should *not* be required to provide a subcontractor who has failed to maintain insurance with written notice and an opportunity to cure.[8] First and foremost, the subcontractor, and *not* the contractor, is in the position to know whether its premium payments are current and whether there are any other problems concerning its insurance coverage. The requirement to maintain insurance coverage is a constant, and all that a subcontractor must do to comply with this requirement is pay its premium payments on a timely basis.

Second, requiring a contractor to provide a subcontractor with notice and an opportunity, of at least five working days, to cure a default because of lack of insurance would place the contractor in an unacceptable position. A contractor in such a situation would have three choices: (1) it could permit the subcontractor to work on the job without any insurance for a minimum of five working days; (2) it could stop work on the project for a minimum of five working days; or (3) it could take over the work on the project in its own name for a minimum of five working days. None of these alternatives is conducive to doing business in today's fast paced and litigious society.

B. Cancellation of Tyro's Liability Insurance Policy

Tyro contends that its liability insurance policy was in full force and effect on October 29, 1986, and, therefore, that Trevose improperly terminated the contract. In support of this contention, Tyro argues that Great American did not do anything to effect the cancellation of Tyro's policy until October 31, 1986 and that Great American did not issue Notices of Cancellation until November 3, 1986.[9] *See* Paper 32, Exhibit C-2 and C-5. Further, Tyro asserts that, under New York law, the insurance policy would not be deemed cancelled until the date that the insurer actually received the Notice of Cancellation from the premium financing company, regardless of the effective date stated on the notice. Finally, Tyro contends that AFCO's cancellation was not effective because it was not issued in accordance with New York's banking and insurance laws.

Trevose maintains that there is no question that Tyro's liability insurance was cancelled effective October 14, 1986. In addition, Trevose asserts that, if that cancellation was wrongful, Tyro has a remedy against AFCO, Great American, and the James A. Wood agency.

Tyro's argument that its policy was not terminated until November 3, 1986 naturally implies that Trevose should have researched New York law to determine (1) whether AFCO's Notice of Cancellation complied with New York law and (2) whether the cancellation was legally effective against Tyro as of the effective date stated on the notice. The imposition of such a burden is untenable.

---

**8.** The only notice requirement in Section 9 provides that the *contractor* receive written notice ten days prior to any cancellation or modification of the subcontractor's insurance. Section 9(b) states in relevant part:

Such proof of insurance shall provide for 10 days written notice to the Contractor prior to the cancellation or modification of any insurance referred to therein.

*See* Paper 14, Exhibit B, at 4.

**9.** This argument ignores the fact that, pursuant to the premium financing agreement, AFCO had the right and the power to cancel Tyro's insurance policy. *See* Paper 13, Exhibit T, at 3, ¶¶ 9 & 10.

To impose such a burden on a contractor involved in a construction project would be extremely disruptive to the timely completion of the project. Contractors in the middle of construction projects must be afforded the freedom to make quick, yet reasonable, decisions in order to avoid potential problems or correct existing problems and, at the same time, to keep things as close to schedule and budget as possible. As one court noted:

> [E]xcept in the middle of a battlefield, nowhere must men coordinate the movement of other men and all materials in the midst of such chaos and with such limited certainty of present facts and future occurrences as in a huge construction project.... Even the most painstaking planning frequently turns out to be mere conjecture and accommodation to changes must necessarily be of the rough, quick and ad hoc sort, analogous to ever-changing commands on the battlefield.

*Blake Constr. Co. v. C.J. Coakley Co.*, 431 A.2d 569, 575 (D.C.App.1981).

■ Recognizing the realities associated with construction projects, I conclude that all that should be required of a contractor prior to terminating a subcontractor for failing to maintain liability insurance coverage is a reasonable good faith investigation into whether the insurance policy has actually been cancelled. Based on the facts of the present case, I further conclude that Trevose's investigation was reasonable and done in good faith. Because the results of that reasonable good-faith investigation showed that Tyro's policy had been cancelled effective October 14, 1986, Trevose's termination of the contract on October 29, 1986 was proper.

As it turned out, the information derived from Trevose's investigation was accurate. Tyro's liability insurance policy was cancelled by AFCO, and the effective date of that cancellation was October 14, 1986. This record leaves no doubt and permits no other conclusion than Tyro breached the contract by failing to maintain its general liability insurance.

Whether the cancellation of Tyro's liability insurance was improper under New York law and, thus, not effective against Tyro until some date after October 14, 1986 is *not* an issue before this court. If Tyro's general liability insurance policy was wrongfully terminated, then Tyro's remedy lies against the James A. Wood agency, Great American, and AFCO [10]—not against an innocent third-party.

### C. Materiality of the Breach

Trevose contends that Tyro's failure to maintain liability insurance was a material breach and, therefore, that Trevose was justified in terminating the contract. In response, Tyro asserts that, even if its liability insurance policy had been cancelled prior to October 29, 1986, failure to maintain its liability insurance as required by the contract was *not* a material breach.

■ Although any contractual default may be considered a breach, it is only when the breach constitutes a material failure that the nonbreaching party is discharged from all further obligations under the contract and is free to terminate the contract. *Oak Ridge Constr. Co. v. Tolley*, 351 Pa. Super. 32, 504 A.2d 1343, 1348 (1985); Restatement (Second) of Contracts §§ 235(a), 237 (1981). Consequently, Trevose's termination of the contract was proper only if Tyro's failure to maintain liability insurance as required by Section 9 of the contract constituted a material breach.

It is widely recognized that there are very serious risks associated with the performance of a construction contract which necessitate insurance coverage. *See* 3 S. Stein, *Construction Law* ¶ 13.16[1] at p. 13–101 (1989); J. Lambert and L. White, *Handbook of Modern Construction Law* 154 (1982).

---

**10.** Tyro is presently proceeding in an action against its insurance agent, insurance company, and premium finance company in the Court of Common Pleas of Philadelphia County—*Tyro Industries, Inc. v. James A. Wood, Inc., Great American Insurance Company, and AFCO Insurance Company*, Docket November Term 1988, No. 601. *See* Paper 13, Affidavit of Paul A. Logan; Paper 35, at 4 n. 1.

The risks incident to a construction project are of such potential magnitude that if those risks mature into claims for money damages, both owners and contractors could be forced into bankruptcy or, at the very least, the outstanding claims could indefinitely postpone the completion of a project. Thus, an obligation to procure insurance is an essential element of managing the risks inherent in a construction project and is written into most construction contracts.

3 S. Stein, *Construction Law* ¶ 13.16[1] at p. 13–101 (1989).

■ In recognition of the critical role of insurance in the construction context, construction contracts almost invariably contain a provision requiring one party to procure and maintain certain types and amounts of insurance. *See id.; Issues in Construction Law: New Perspectives on Liability and Contracts*, 1988 A.B.A. Real Prop., Prob. & Tr.L. Sec. 314–15. Where, as in the present case, certificates of insurance are required to be submitted to the contractor before any work under the contract can be performed, the obligation to carry insurance and obtain the certificates is a condition precedent to the contract and failure to satisfy that condition justifies termination of the contract. *See* 3 S. Stein, *Construction Law* ¶ 13.16[2] at p. 13–107 (1989); II *Construction & Design Law* § 30.6 at 14 (1984).

■ It is also recognized that the requirement that a subcontractor obtain insurance is a material term in a construction contract and that failure to obtain such insurance constitutes a material breach of contract. *See Adams v. Fred Weber, Inc.,* 849 F.2d 1018 (7th Cir.1988) (subcontractor who failed to procure liability insurance naming general contractor as an additional insured was liable for breach of contract); *Washington Metropolitan Area Transit Authority v. Mergentime Corp.,* 626 F.2d 959 (D.C.Cir.1980) (subcontractor breached contract by failing to procure insurance policies); 3 S. Stein, *Construction Law* ¶ 13.16[3] at 13–107 (1989) (the failure to procure insurance as required by the contract creates a cause of action against the promisor for breach of contract); II *Construction & Design Law* § 30.6 at 14 (1984) (failure to provide insurance as required by the contract could constitute a material breach whereupon the promisee would be justified in terminating the contract).

[9] Certainly, failing to obtain the required insurance is no worse than failing to maintain the required insurance. It follows, therefore, that failure to maintain the required insurance also constitutes a material breach, justifying termination of the contract. *See Matter of T & B General Contracting, Inc.,* 12 B.R. 234 (Bankr.M.D. Fla.1981) (cancellation of subcontractor's workers' compensation and liability insurance after commencement of work permitted termination of the contract by the general contractor).

With this background in the area of construction contracts, I must now view the facts of the present case to determine whether Tyro's breach was material. Under Pennsylvania law, the following five factors are considered in determining whether a breach is material:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standard of good faith and fair dealing.

*Oak Ridge Constr. Co. v. Tolley,* 351 Pa. Super. 32, 504 A.2d 1343, 1348 (1989) (quoting Restatement (Second) of Contracts § 241).

By failing to maintain liability insurance coverage, Tyro deprived Trevose of the benefit which it expected under the contract—the construction of the reinforced earth walls. Section 9 of the contract required Tyro to obtain general liability insurance coverage, and written proof thereof, before commencing performance of any work under the contract. Section 9 also required Tyro to maintain that insurance coverage in full force and effect during the term of the contract. Therefore, Tyro was only permitted to work on the construction project if it had general liability insurance coverage.

Clearly, Trevose can be adequately compensated by an award of damages for Tyro's failure to complete the construction of the reinforced earth walls. Furthermore, there can be no doubt that Tyro will suffer a forfeiture if I conclude that its breach was material. However, the value of any benefit which Tyro conferred upon Trevose and for which it has not already been paid would be taken into consideration when calculating the damages suffered by Trevose as the result of Tyro's material breach.

With respect to the fourth factor, taking into account all of the circumstances, it was *not* likely that Tyro could have or would have cured its default. From the outset, Tyro had problems with AFCO and its general liability insurance policy. Tyro did *not* even pay its first installment, due August 29, 1986, on time. *See* Paper 17, Exhibit B, AFCO/Tyro Premium Finance Agreement; Paper 13, Exhibit V, Letter Dated September 17, 1986. In fact, Tyro never paid AFCO any installment payment on time. Even though Tyro was aware of its problems with AFCO, the record does *not* establish that Tyro took any steps to permanently resolve those problems.[11] *See* Paper 13, Affidavit of Robert B. Ramsay, ¶ 27. Furthermore, as a result of correspondence from AFCO and its insurance agency, Tyro knew that the cancellation of its liability insurance was imminent if it did not pay certain premiums by a certain date. *See* Paper 13, Exhibit V & Exhibit W. In a letter dated October 24, 1986, the James A. Wood agency informed Tyro that its liability insurance had been cancelled effective October 14, 1986, but that AFCO had agreed to request reinstatement of Tyro's insurance if AFCO received a money order or certified check in the amount of $3,536.80 by October 29, 1986. *See* Paper 13, Exhibit V, Letter Dated October 24, 1986. In spite of this, Tyro did *not* send AFCO the money which was due. Moreover, there is nothing in the record to show that Tyro could have sent AFCO the money which was due.

Finally, the fifth factor requires me to analyze whether Tyro's behavior comports with standards of good faith and fair dealing.[12] When Tyro spoke to Trevose on October 29, 1986 concerning the status of its liability insurance, it knew three things: (1) its policy had been cancelled effective October 14, 1986; (2) its policy would be reinstated if AFCO received a money order or certified check for $3,536.80 by October 29, 1986; and (3) it had *not* sent AFCO a money order or certified check for $3,536.80. Nevertheless, Tyro insisted that its liability insurance was in full force and effect,[13] and failed to mention any of its problems with AFCO.

The contract imposed an obligation on Tyro to maintain its liability insurance cov-

---

**11.** Tyro contends that it was improper for AFCO to apply the return premium of $14,841.00 to decrease the face value of the loan without first consulting with and obtaining Tyro's consent. *See* Paper 13, Affidavit of Robert B. Ramsay, ¶ 28. Tyro maintains that AFCO should have applied the return premium to satisfy the first seven installments due under the Premium Finance Agreement. *See id.* However, there is nothing in the record to show that Tyro ever wrote AFCO a letter to that effect or spoke to anyone at AFCO about its concerns.

**12.** Tyro contends that its efforts during October 1986 to have its insurance policy reinstated demonstrate that it did not act in bad faith. Other than talking to its insurance agency, Tyro did nothing to attempt to have its policy reinstated or to work out its differences with AFCO. The letter from the James A. Wood agency dated October 24, 1986 informed Tyro what was necessary to effect reinstatement; however, there is nothing in the record to evidence that Tyro made any effort to send AFCO the $3,536.80 by the due date of October 29, 1986.

**13.** Even if Great American informed Tyro on October 29, 1986 that his liability insurance policy was in effect, Tyro knew that AFCO had

erage and further provided that Trevose receive written notice ten days prior to cancellation. Therefore, when Tyro realized that its policy was going to be cancelled and that it was not going to be able to pay the installment payment by the due date, Tyro was under a duty to inform Trevose that it was experiencing problems with its premium finance company and that its policy was going to be cancelled for nonpayment. Moreover, on October 29, 1986, when Trevose questioned Tyro about the status of its liability insurance, Tyro should have taken that opportunity to be candid with Trevose by admitting that its liability insurance policy had been cancelled effective October 14, 1986. Therefore, I conclude that Tyro's dealings with Trevose did *not* comport with standards of good faith and fair dealing.

Considering all of these factors, as well as the critical role of insurance in the construction context, it is painfully clear that Tyro materially breached Section 9 of the contract by failing to maintain its liability insurance.

### IV. CONCLUSION

Trevose's termination of its contract with Tyro on October 29, 1986 was proper. Tyro's liability insurance was cancelled on October 14, 1986. Therefore, on October 29, 1986, Tyro was in material breach of the contract for failing to maintain its general liability insurance coverage as required by the contract. Because Tyro's contractual default pertained to the insurance requirements contained in Section 9, Trevose was not required to provide Tyro with written notice and an opportunity to cure prior to termination.

Consequently, by an order dated March 30, 1990, I denied Tyro's motion for summary judgment and granted Trevose's motion for summary judgment.

the power to cancel its insurance policy and that AFCO had used that power to cancel its policy effective October 14, 1986. *See* Paper 13, Affidavit of Robert B. Ramsay, ¶ 39. In other words, simply because Great American informed Tyro that its policy was in effect did *not* establish that the policy had not been cancelled by AFCO.