Alexander KERSHENTSEV, Yury Bredikhin, Valery Goncharov, Valery Popov, Vladimir Shumeikin, Galina Shumeikina, Alexander Boitsov, Irina Boitsova, Alexi Sharov, Natalia Sharova, Timur Burtasenkov, Vlada Sheveryako, Gennady Sheveryako, Inga Luberenko, Alexey Koryagin, Svetlana Krilova, Marina Belavina, Ella Rybalko, Vita Yanchuk, Tatyana Gritsovnik, Victor Yyelkin, Vladimir Kovalenko, Alexi Borovik, Natalia Akhumarova, and Vadim Pisarev

v.

MASCOTTE PRODUCTIONS, INC., Carl Kusnell, Gary Green and Alexander Greenspan and Alden Park Manor.

Civ. A. No. 91–6300.

United States District Court, E.D. Pennsylvania.

Dec. 4, 1991.

Richard D. Malmed, Philadelphia, Pa., for plaintiffs.

Sidney J. Smolinsky, Philadelphia, Pa., for defendants.

## MEMORANDUM DECISION AND ORDER

VAN ANTWERPEN, District Judge.

From November 4, 1991 through November 9, 1991, a hearing was held on Plaintiffs' request for a permanent injunction and Defendants' motion for a preliminary injunction in the above-captioned matter, a self-styled complaint in equity. Plaintiffs ask this court to order that the Exclusive Booking Agreement (the "Booking Agreement") and Exclusive Agent Agreement (the "Agent Agreement") signed by Mascotte Productions, Inc. and Plaintiff Vadim Pisarev are null and void, that Defendants not interfere with Plaintiffs' work or lodging arrangements, that Defendants render an accounting for all funds they have received or expended on Plaintiffs' behalf, and that Defendants pay over to Plaintiffs all funds received on Plaintiffs' behalf which have not been properly expended.[1] Defendants ask for an injunction enjoining Plaintiff Vadim Pisarev ("Pisarev") from breaching the Booking Agreement and Agent Agreement. At issue in this case is not only the validity and meaning of those agreements, and whether either signatory breached one or both of them, but also the relationship between the other named plaintiffs and the defendants—whether there is a contract between them, an agency relationship or a fiduciary relationship. After reviewing the testimony and exhibits presented at trial, we make the following findings of fact and state the following conclusions of law, pursuant to Fed. R.Civ.P. 52(a).

## FINDINGS OF FACT

1. All Plaintiffs are citizens of the U.S.S.R. and all Defendants are citizens of either Pennsylvania or Ohio and the amount in controversy in this action exceeds $50,000.

2. All Plaintiffs except Natalia Akhumarova and Alexi Borovik are members of a Ukrainian ballet troupe known as the

---

1. In their Amended Complaint Plaintiffs also seek damages but the hearing during the week of November 4th was agreed to be a final hearing on the injunction issues only.

Donetsk Ballet Company (the "Company"). Akhumarova and Borovik are Russian ballet dancers who have affiliated themselves with the Company as guest dancers.

3. The Donetsk Ballet Company was established approximately fifty years ago in the city of Donetsk, Ukraine, U.S.S.R. It is now world famous, thanks in large part to the efforts of its artistic director, Plaintiff Vladimir Shumeikin, who has been instrumental in selecting young dancers fresh out of ballet school, training them in the traditional Russian style of ballet, and molding them into a distinctive company. The type of classical repertoire in which the Company specializes, including such works as *Don Quixote, Swan Lake*, and *Walpurgis Night*, requires that the members of the Company work together for many years to perfect their performances. (11/4/91 Tr. at 48–49, 88–89, Pisarev Direct.)

4. Plaintiff Vadim Pisarev has been the principal performer of the Company for eight years, since he left school. At the age of twenty-six, Pisarev is one of the world's leading ballet dancers, having won many gold medals in international ballet competitions, and having been named Best Male Dancer in the USSR in 1990. He has trained for the ballet for the past twenty years, and has no training and little experience in dealing with the business side of the arts and entertainment world. Indeed, until Glasnost freed him to make his own contracts with Westerners, he danced solely as an employee of the Soviet government. (11/4/91 Tr. at 45, 48, Pisarev Direct.)

5. Plaintiff Alexander Kershentsev, a Ukrainian businessman, is both Vadim Pisarev's and the Company's business manager. Mr. Kershentsev, through his company, Kalmius, has a contract with the Donetsk Theater of Opera and Ballet (the "Theater"), the employer of the members of the Company, pursuant to which he pays the Theater 15,000 rubles per month for the services of the dancers of the Company and for the use of the Company's sets, costumes and equipment. (Pls.'s Ex. 10 and 11/5/91 Tr. at 59–63, Kershentsev Direct; 11/8/91 Tr. at 97–99, Pozigun Direct.) He also has a separate contract with Vadim Pisarev which provides that in exchange for a percentage of profits, Kershentsev would provide services, both in the U.S.S.R. and abroad, including commercials, showing of commercial films starring Pisarev, other media exposure, organizing tours and performances, and foreign and Soviet negotiations. (Pl.s' Ex. 3, a copy of the contract, dated October 21, 1990, and an English translation stipulated to be accurate. (11/4/91 Tr. at 59, Pisarev Direct.)

6. Defendant Mascotte Productions, Inc. is a Pennsylvania corporation with its principal place of business in Pennsylvania. It was formed in April of 1991 to assist and arrange tours throughout the world for the Donetsk Ballet Company.[2] Although Mascotte's articles of incorporation were filed with the Secretary of State of the Commonwealth of Pennsylvania, no formal first meeting of incorporators or directors was held, no board of directors was ever created, and thus no officers were ever formally appointed. (11/6/91 Tr. at 59–71, Kusnell Direct.)

7. Defendant Carl Kusnell is a citizen of Pennsylvania. Mr. Kusnell owns a company called Communications Facilities Management Corporation ("CFMC"), which owns and maintains hotel telephone systems. He has appeared several times as a performer in minor roles in classical musical productions, but had never worked as

---

**2.** We note Plaintiffs' Exhibit 16, p. 216, a letter from Carl Kusnell, purporting to be the president of Mascotte, to the U.S. Department of State, Immigration and Naturalization Service. Mr. Kusnell's testimony at trial apparently contradicted several statements in this letter. Either Mr. Kusnell was incorrect at trial, or he made false statements in this letter, which would be a violation of 18 U.S.C. § 1001, which provides for a penalty of up to five years imprisonment and a fine of $10,000 for making false statements to an agency of the United States. The letter is consistent with the trial testimony of Vadim Pisarev and others discussed infra, who said that Mascotte represented the Donetsk Ballet Company.

an agent or booking agent or producer in the arts or entertainment businesses. (11/5/91 Tr. at 105–06, Robb Direct.) Mr. Kusnell has acted as the president of Mascotte since May, 1991, with the consent of Alexander Greenspan and Gary Green.

8. Defendant Gary Green, Esq. is a Pennsylvania citizen and licensed attorney. Green has represented Carl Kusnell and Defendant Alexander Greenspan in a variety of business ventures, but had little or no experience in the field of entertainment law, or in the arts or entertainment businesses in general, before becoming involved with Mascotte. Green had also represented and become friends with a man named James Robb, and knew that Robb was involved in the arts. (11/6/91 Tr. at 147–58, Green Direct.) Robb is a cultural program director for the City of Philadelphia, and has worked as the president and executive director of the Performing Arts Society in Philadelphia. He is familiar with presenting classical musical and dance performances and other cultural events. (11/6/91 Tr. at 101–02, Robb Direct.)

9. Defendant Alexander Greenspan is a citizen of Ohio who emigrated from the Soviet Union in the early 1970's and now has numerous contacts in the Soviet and Russian governments. He is a principal in a company called the Federal Institute of Negotiation, also known by its acronym "FIN," which brokers business deals between American companies and Soviet companies or government entities. Mr. Greenspan had no significant experience in the arts or entertainment businesses before he became involved with Mascotte. (11/6/91 Tr. at 153, Green Direct.)

10. In April, 1991, the members of the Donetsk Ballet Company, including Vadim Pisarev and Alexander Kershentsev, came to the United States to stage a performance in Baltimore. Because he wished to establish a base of operations in the United States and obtain sponsorship for the Company, Pisarev arranged to meet with Alexander Greenspan, who had expressed interest in helping to publicize the Company when he and Pisarev first met in Russia. (11/4/91 Tr. at 70–71, Pisarev Direct.) The meeting was to take place at the offices of Greenspan's attorney, Gary Green, of the Philadelphia law firm Sidkoff, Pincus & Green.

11. Pisarev believed at the time that Greenspan's company was connected to the American government, not only because Greenspan often negotiated with high level Soviet officials in business deals, but also because the name of Greenspan's company Federal Institute of Negotiation, contained the word federal, which translates into Russian as "gos"—state. Just as the name of his own ballet theater, "Donetsk State Ballet," signified control by the Ukrainian government, Pisarev believed that "Federal" signified that FIN was controlled by the American government. (11/4/91 Tr. at 71–72, Pisarev Direct.)

12. On April 26, 1991, Kershentsev, Pisarev and Kershentsev's assistant and translator, Helen Pozigun, went to Philadelphia to meet with Greenspan. They did not bring an attorney with them, fearing that if they did, it would imply that they didn't trust Greenspan and Green. (11/4/91 Tr. at 72–73, Pisarev Direct.) Greenspan had told Pisarev over the telephone not to worry about bringing a lawyer because "we have a lawyer ... everything would be according to the law ... Gary Green would be our lawyer."[3] (*Id.* at 127).

13. Green arranged for two other men, Carl Kusnell and James Robb, to come to the meeting. (11/4/91 Tr. at 126, Pisarev

---

**3.** While there is insufficient evidence to make a finding of fact in this regard, we note that there is some indication that Gary Green himself was not in strict compliance with the ethical requirement that, in dealing with a person who is not represented by counsel, an attorney should not imply that the lawyer is disinterested, or give advice to the unrepresented party whose interests are or have a reasonable possibility of being in conflict with the interests of the attorney's client. In addition, when an attorney knows that the unrepresented person misunderstands the attorney's role in the matter, the attorney should make reasonable efforts to correct the

Direct.) Since Pisarev and Kershentsev spoke very little English, and the other parties to the meeting, with the exception of Greenspan, spoke no Russian or Ukrainian, Helen Pozigun translated most of the discussions between the Ukrainians and the Americans. At many points during the meeting, however, Greenspan conversed directly with Pisarev or Kershentsev in Russian, outside the presence of Helen Pozigun. The meeting lasted from about three o'clock in the afternoon until about eleven o'clock in the evening. (*Id.* at 125.)

14. The various parties had very different expectations going into the meeting, and very different understandings of the roles each participant in the venture would play. Pisarev and Kershentsev hoped to obtain a sponsor for the ballet company— someone to finance productions by investing money in the ballet. (11/4/91 Tr. at 71, Pisarev Direct.) Pisarev wanted someone to help find U.S. engagements for the Company finance productions. He did not want to abandon his friends, the members of the Donetsk Ballet Company, and strike out on his own to establish a solo career. (11/8/91 Tr. at 91, Pozigun Direct.) Greenspan and Kusnell, on the other hand, expected to make lots of money by promoting Pisarev as an individual star, and turning him into a "personality" who could make movies, endorse products, and dance alone or with a few supporting dancers in high capacity arenas or sports stadiums. (11/6/91 Tr. at 166–67, Green Direct; 11/5/91 Tr. at 121, Robb Direct.)

15. At this April 26th meeting, the parties discussed a deal in which a corporation called Mascotte Productions, Inc. would be formed to help promote Pisarev's career and obtain bookings for Pisarev and the other members of the Donetsk Company. The deal was to be structured to facilitate Pisarev's accumulating funds in the United States so the funds would not be expatriated to the Soviet Union, and also to provide that those who worked in the venture would be compensated for their services out of any profits. To this end, it was proposed that Pisarev and his wife would own some shares in the corporation, and the rest of the shares would be divided among the other participants in the venture, as compensation for the work they did in the venture. The exact allocation of shares would be determined after Alexander Greenspan determined whether the law of the Soviet Union would permit Pisarev to keep in the United States any profits earned from a share of Mascotte, and after Defendants determined exactly whose services would be needed to carry out the plan to promote Pisarev and the Troupe and obtain performances and other engagements for them. (11/6/91 Tr. at 62, 71, Kusnell Direct.)

16. During the meeting, Kershentsev had a conversation with Greenspan in Russian in which he explained to Greenspan that Kershentsev had a contract with Pisarev to represent him and act as his business manager. He showed Greenspan a copy of his written contract with Pisarev, (Pls.' Ex. 3), but Greenspan put the document aside and told him that that kind of contract wasn't valid in the United States. (11/4/91 Tr. at 134, Pisarev's Cross.)

17. Pisarev and Kershentsev also showed Defendants two written performance agreements with BACI Management, Inc. (Pls.' Ex. 1 and 2.) Under these agreements, the Donetsk Ballet Company, through Kershentsev and Pisarev, as the Company's "General Manager" and "Director," respectively, agreed to perform two tours, one in the spring of 1991 and one in the fall of 1991. In exchange, Baci Management agreed to pay $4500 per performance, $30 per diem to each Company member, lodging and tax, transportation while on tour, one meal per day when the Company was performing, and half the round trip airfare from the U.S.S.R. to the U.S.

18. During this April 26th meeting, Alexander Greenspan suggested that Kershentsev and Pisarev write out a list of proposals for a contract. At a second

misunderstanding. Rule 4.3, Pennsylvania Rules of Professional Conduct.

meeting, on May 1st, Kershentsev and Pisarev did present a written list of proposed terms. (11/5/91 Tr. at 95, Kershentsev Cross; Pls.' Ex. 4.) At this point, Kershentsev, Pisarev's business manager and advisor, was asked to leave the room so that Green and Greenspan could discuss the contract with Pisarev privately. They talked for an hour or two, and then allowed Kershentsev and Helen Pozigun to rejoin them. Pisarev was very pleased with the result of the private conversation with Greenspan and Green, and believed that the venture would turn out very well.

19. Since Alexander Greenspan did not testify at the hearing, and Gary Green did not understand the Russian language discussions between Greenspan and Pisarev, and so could only testify about those conversations based on what Greenspan told him, we must give more weight to Vadim Pisarev's version of that private discussion than to the Defendants' version. It is clear that Pisarev believed that substantially all of his and Kershentsev's proposals had been accepted, and that the contracts Gary Green was drawing up would enact the deal they had discussed. (11/4/91 Tr. at 74-78, Pisarev Direct.) After more discussions, Green presented a draft contract and, since Defendants did not have a written Russian translation of the contract, they arranged to have it read to Pisarev aloud in Russian. Helen Pozigun translated it with the help of a Russian lawyer associated with Green's law firm.

20. Despite hours of such oral translation, Pisarev failed to grasp some of the fundamental elements of the contract. He did not understand the translation of "power of attorney," and did not realize that the terms of the contract granted Mascotte the power to sign his name to contracts. He did not understand what a corporation was. Based on his discussions with Defendants, he thought it was some sort of trust arrangement, like a savings account, into which his performance fees would be deposited, and from which he could withdraw them at will. He didn't understand that if he signed the contract, he forfeited the right to use his own name in performances not arranged by Mascotte. He also didn't understand the commission structure which the two contracts set up, under which Mascotte is entitled to 20% of any fees as an agent's commission, and 15% of any fees as a booking agent's commission.[4] Pisarev had never paid as much as 35% as a commission to any agent. Pisarev was not interested in the details of the document, and preferred to rely on the oral reassurances given him by Defendants that the deal would work out well. (11/4/91 Tr. at 74-78, Pisarev Direct.)

21. After many hours of listening to extended translations, questions, explanations, hypothetical situations and examples translated from English to Russian and back again, Pisarev gave up trying to understand the contracts Green had drafted and decided to call it a night. Green insisted, however, that the contracts be signed that night, even though it was quite late and everybody was very tired. Against Kershentsev's advice, and despite not fully understanding the written agreements, Pisarev capitulated and signed the English version of the contract, with the understanding that a written Russian translation would be provided as soon as possible. That translation was not provided until July, more than two months later. (11/4/91 Tr. at 141-45, 11/5/91 Tr. at 36, Pisarev Cross.)

22. Pisarev signed the Agent Agreement in his own name, and the Booking Agreement both for himself and for the "Troupe." "Troupe" is defined elsewhere in the Booking Agreement as "any group of dancers with which [Pisarev] is affiliated." We find that the Troupe with which Pisarev was affiliated, both at the time of contracting and at all times relevant to this decision, was the Donetsk Ballet Company. Not only did Pisarev testify that that was his intent, but Carl Kusnell states that the Donetsk Ballet Company is a party to the contract in his June 20, 1991

---

4. It is not even entirely clear to the court how the Booking and Agent Agreements are supposed to interact in determining Mascotte's commission when Mascotte lines up a performance for Pisarev and the Donetsk Company.

letter to the Immigration and Naturalization Service. (Pls.' Ex. 16 at 216.) The other party to the contracts, Mascotte Productions, Inc., purportedly signed by Carl Kusnell as its president.

23. In its final form, the Booking Agreement essentially provides that Mascotte shall act as Pisarev's and the Troupe's exclusive agent in procuring performances, and shall perform "all services customarily performed by an Agent." It grants Mascotte an irrevocable power of attorney in fact. The agreement states that Mascotte receives 15% of any fees payable to Pisarev or the Troupe for any live dance performances, and 65% of any fees payable to Pisarev or the Troupe for anything other than live performances, such as books, movies, or television shows. The contract provides that Pisarev agrees to perform to the best of his abilities in any opportunities procured by Mascotte, and to use his best efforts to cause the Troupe to appear. Mascotte agrees to use reasonable efforts to obtain performance opportunities for Pisarev and the Troupe and to assist in negotiating agreements and earning money as a dancer or celebrity. Any sums advanced to or any expenses incurred on behalf of Pisarev are to be deemed loans to him, to be repaid out of the first gross sums paid to Pisarev from any third party.

24. The Agent Agreement contains many of the same terms as the Booking Agreement, but confines itself to Pisarev and Mascotte, not referring to the Troupe at all. The other main difference between the two writings is that the Agent Agreement sets the commission due Mascotte at 20%, rather than 15% or 65%. No mention is made of the interaction between the Booking and Agent commissions, and it was not clear from the testimony whether the parties intended that the commissions under the two agreements be cumulative or not. Under the Agent Agreement, Mascotte agrees to use reasonable efforts to counsel and advise Pisarev in matters relating to his career, and to assist Pisarev in negotiating agreements and earning sums as a dancer or celebrity.

25. It was the intent of the parties at the time of contracting that Vadim Pisarev have artistic control over the dancers and performances—he had the exclusive right to select the company of dancers with which he wished to dance, and it was his responsibility and right to provide a prepared and rehearsed troupe of dancers, as well as all equipment, scenery, music, personnel, and anything else required to make the performances of excellent quality. (Pls.' Ex. 5 at section III.) Pisarev had the exclusive right to designate the ballet company which would be the "Troupe" under the Booking Agreement, and he exercised that right by affiliating himself with the Donetsk Ballet Company. (11/8/91 Tr. at 102, 110, Helen Pozigun Direct.)

26. It was an implied condition of the Booking and Agent Agreements that the corporate formalities be carried out—shares in Mascotte would be issued, a board of directors selected, and officers appointed. Since one of the essential reasons for the contracts was facilitating Pisarev's keeping funds earned through performing outside the U.S.S.R., it was important to the parties, especially to Pisarev, that Alexander Greenspan fulfill his promise to determine the effect of Soviet law on the venture and that Defendants restructure the corporate form of the venture if necessary to achieve that goal. Pisarev would not have agreed to the terms expressed in the written agreements if it became necessary to change the proposed allocation of shares.

27. As Defendants' counsel conceded at trial in his closing argument, the friction between Defendants and Kershentsev soon accelerated into an all out war between them, complete with espionage, defections, disinformation and sabotage. (11/9/91 Tr. at 37.) The Company's Artistic Director was drawn into the fight, and so were Vadim Pisarev, Helen Pozigun, and eventually the whole Company. The facts as we recount them below show that the trust relationship between Plaintiffs and Defendants is irretrievably destroyed. They will never be able to work together in a productive fashion again.

*Mismanagement of Funds and*
*Failure to Account*

28. Before entering the Mascotte venture, Pisarev and the Company had already arranged to perform during the summer of 1991 in both Jackson, Mississippi and Genoa, Italy.[5] Both of these performances generated more conflicts between Plaintiffs and Defendants, both in disputes over disposition of the performance fees and in disputes over the artistic control of the Company.

29. The Company was to receive $17,929 for the Jackson performance. (the "Jackson fee") (11/6/91 Tr. at 34.) Because Alexander Kershentsev did not have a bank account in Philadelphia in which to deposit the checks sent to him from Jackson, Carl Kusnell arranged for the funds to be wired to Sidkoff, Pincus & Green's escrow account at Continental Bank. (11/6/91 Tr. at 50, Kusnell Direct.) Gary Green, a partner in Sidkoff, Pincus & Green, instructed his bookkeeper, Adrian Hassinger, to do whatever Carl Kusnell wanted done with those funds, because the firm was merely a holding agent for the money. (11/8/91 Tr. at 31, Hassinger direct.) In addition, Green specifically instructed Hassinger not to obtain a receipt when she disbursed the funds. (11/8/91 Tr. at 37, Hassinger direct.)

30. Plaintiffs stipulate that they have received $5000 of that Jackson fee. (11/5/91 Tr. at 78, Kershentsev's Cross.) $2,929 of the fee remained in the Sidkoff account until June 17th and July 12th, when it was transferred to a separate Mascotte Productions, Inc. account, under the control of Carl Kusnell. (11/8/91 Tr. at 43–44, Hassinger direct.) The remaining $10,000 is missing. Carl Kusnell authorized Sidkoff, Pincus & Green to make the $10,000 available for pickup by James Robb. (11/6/91 Tr. at 55, Kusnell Direct.) The law firm withdrew the $10,000 in cash from its escrow account in two separate $5000 transactions, but James Robb did not receive the money.

31. Neither Sidkoff, Pincus & Green nor Carl Kusnell have produced any signed receipts showing the disposition of those funds. Defendants rely completely on the testimony of two employees of the law firm, a bookkeeper and a receptionist, who testified that they delivered the missing cash to James Robb on two different occasions at the Sidkoff offices, and that they believed he was going to give the money to Alexander Kershentsev. However, there is other evidence which suggests that the cash was intended to go to Carl Kusnell, not to Kershentsev. The bookkeeper, Adrian Hassinger, testified that she delivered $5000 to Robb on June 7, saying "here's the envelope I'm supposed to give ... you with the money to take back to Mr. Kusnell's office." (11/8/91 Tr. at 39, Hassinger direct.)

32. James Robb's testimony was very credible. He picked up one envelope at the Sidkoff offices and delivered it to Alexander Kershentsev, not knowing what it contained. As it turns out, it contained $5000 in cash—the part of the Jackson fee which Plaintiffs stipulate they received. (11/8/91 Tr. at 219, Robb's examination by the Court.)

33. The Sidkoff, Pincus & Green bookkeeper and receptionist who testified, on the other hand, were not overly familiar with Robb's appearance at the time of the alleged deliveries, and it is quite likely that they are mistaken in their belief that he picked up the envelopes in question. Adrian Hassinger, the bookkeeper, believes that she only met Robb three times. (11/8/91 Tr. at 48, Hassinger direct.) One of those three was apparently *after* the alleged delivery of cash, when Robb came to her office to pick up a checkbook and deposit slips to deliver to Kusnell. (11/8/91 Tr. at 43, Hassinger direct.) One, presumably, was the time of the alleged delivery, and thus she could only have met him once

---

5. While the Booking and Agent Agreements are unclear about whether Mascotte would be entitled to a commission under their terms for these performances arranged before the contracts were signed, Defendant Kusnell has agreed that Mascotte will not take a commission for those engagements. (11/6/91 Tr. at 123.)

before the occasion when she claims to remember handing him cash. Hassinger's in-court identification of James Robb could easily have been based on this more recent encounter with him.

34. Sharyn Davies, Sidkoff Pincus & Green's receptionist, stated that she handed an envelope to a man identifying himself as James Robb on two separate occasions in late spring or early summer of this year. She did not testify that she recognized the man at the time of the alleged delivery to be James Robb. She did not tell the man that the envelope contained money. She did not obtain a receipt, and in fact she was specifically instructed by her superior not to obtain a receipt. She was not sure how many times she had met Robb before, and she couldn't remember what the man to whom she gave the envelopes was wearing, or even if he was wearing a suit or a tie.

35. Based on these facts, we cannot make a determination of where the missing money is, apart from the fact that it was delivered to Sidkoff, Pincus & Green, with the knowledge and consent of partner Gary Green, that Gary Green knew that the money was payment to Plaintiffs for their work in Jackson, and that Green placed the money under the control of Carl Kusnell.

36. In addition to misplacing part of the Jackson performance fee, Carl Kusnell used sloppy accounting practices in dealing with the fee the Company received from their performances in Genoa, Italy and routinely lied about the amounts of various expenditures he claimed to be making on Plaintiffs' behalf. Kusnell refused initial requests of Alexander Kershentsev, made on behalf of Vadim Pisarev, for an accounting for monies received and disbursed by Kusnell on the Company's behalf. (11/5/91 Tr. at 24, Pisarev Cross.)

37. Kusnell received at least $32,528 as the Company's fee for the Genoa performances, as he admitted in Plaintiffs' Exhibit 15 ("P-15"). P-15 is a two page typewritten document prepared by Kusnell after this suit was filed and entitled "Mascotte Productions Statement of Income and Expenses May 15, 1991 to September 5, 1991." It lists amounts of money received and

expended in broad categories, such as "American furniture rental," "Italy concert expenses," "printing," "reimburse J. Robb," and "Phila. tour." The largest category is "Cash Payments to Dancers," $47,960. No receipts are attached, although some receipts are provided, without explanation, in the bound volume produced in discovery, admitted into evidence as P-16.

38. P-15 also lists what purport to be "Expenses still owing," including "Medical Bills," "LaSalle Housing," "Lasalle Meal Plan," "American Express for ballet related travel to Paris" and "Mascotte Agency Fee (20% × $65,457)". There was insufficient evidence at the hearing to find that Mascotte Productions or Carl Kusnell are personally liable for these bills. The medical bills are in the names of the individual patients, and Mascotte is not mentioned, although Kusnell's company, CFMC, is listed on some papers as "guarantor." The LaSalle bills are addressed to "Donetsk Ballet Company c/o Carl Kusnell," at CFMC's address, not to Mascotte or Kusnell personally. The letter LaSalle sent to Kusnell in May confirming the housing arrangements make no mention of Mascotte, and specifically state that the accommodations are to be provided to the *Donetsk Ballet Company.* Defendants have not produced a bill from American Express. Most troubling is the "Mascotte Agency Fee" listing, since the amount stated as the basis for the fee, $65,457, is the amount paid into Mascotte (or to Kusnell personally) for the performances of the whole Company, not just Vadim Pisarev, and the Company never agreed to pay Mascotte 20% of their fees.

39. Neither P-15 nor P-16, the bound volume of documents produced by Defendants in discovery, is an intelligible accounting of Mascotte's or Kusnell's expenditures of Plaintiffs' money. Many of the papers reproduced are handwritten by Kusnell, and none are accompanied by any explanation.

40. Not only did Kusnell fail to account properly, he misled members of the Company about the amounts of expenditures, ex-

aggerating the costs of housing, medical insurance and the services of an immigration lawyer so the Company would not ask where their money was. He told Alexander Kershentsev that he had spent $100,000 to get visas for the Company, when in fact the immigration lawyer Kusnell hired charged only $3231.96. (11/5/91 Tr. at 53, Kershentsev Direct; Pls.' Ex. 16 at 209 (Attorney Steven Barsamian's bill.)[6] Kusnell told James Robb that the LaSalle housing cost $200,000 to $450,000, and he told Alexander Kershentsev that medical insurance for the Company would cost $250,000. (11/5/91 Tr. at 125, 56, Robb and Kershentsev Direct.) Kusnell told Pisarev that the Company's housing at Alden Park Manor in Philadelphia cost $20,000 per month, when in fact it cost $7000 per month. (11/4/91 Tr. at 95, Pisarev Direct.) Kusnell told Pisarev and others in the summer of 1991 that he had spent $600,000 of his own money thus far, when in fact that was false. (11/5/91 Tr. at 40, Pisarev Direct.)

### Failure to Follow Instructions and Interference with Artistic Control of the Company

41. Almost from the beginning of their relationship, Carl Kusnell tried to interfere with Pisarev's artistic control of the Company. Rather than advising Pisarev and acting as his agent, Kusnell tried to assume a controlling role, giving orders to the Pisarev and the Company, restricting their movements and attempting to alter the internal structure of the Company. Kusnell testified that he did not believe that he was working for Pisarev. (11/6/91 Tr. at 90, Kusnell Direct.) He told Pisarev that there was only one voice and one way—his own. (11/4/91 Tr. at 82, Pisarev Direct.) He disregarded Pisarev's wishes

by trying to remove the internationally recognized Vladimir Shumeikin as Artistic Director of the Company and replace him with James Robb, a man who freely admits that it would be preposterous for him to even attempt to perform that job. (11/4/91 Tr. at 89–91, Pisarev Direct.) Kusnell also tried to remove Alexander Kershentsev from his job as business manager of the company, against Pisarev's wishes, and threatened to have both Shumeikin and Kershentsev deported if they did not obey him. (11/5/91 Tr. at 67, 127, Kershentsev Direct, Robb Direct; 11/4/91 Tr. at 87, Pisarev Direct.)

42. Kusnell had the locks on all the Company members' apartments in Philadelphia changed, and tried to evict Kershentsev and Shumeikin from their apartments because they wouldn't obey him, all against Pisarev's wishes. (11/5/91 Tr. at 65–69, Kershentsev Direct.)[7] If Kusnell had been successful in his attempts to seize total control of the dance company, the Company would have fallen apart. Shumeikin, especially, was essential to the functioning of the Company—he was its artistic soul, and his direction and choreography were responsible for raising the Company to its present level of international recognition.

43. Kusnell tried to restrict the movements and activities of the dancers in the Company. While they were living at LaSalle, he forbade them from leaving without translator Helen Pozigun, and tried to prevent several Company members from returning to the Soviet Union by telling them that, as Russian citizens, they were not allowed to leave the security zone around LaSalle. (11/4/91 Tr. at 85–86, Pisarev Direct.) Kusnell also tried to prevent James Robb from visiting the dancers

---

6. Kusnell also exaggerated the attorney fees for the visas to James Robb, telling him they were from $150,000 to $250,000. Robb only learned the true amount of the fee when he called Steven Barsamian on August 20, 1991 to inquire for the dancers about the status of the application and the lawyer corrected him about the amount of the fee. (11/5/91 Tr. at 125, Robb Direct.) Interestingly, Barsamian then felt compelled to ask Kusnell not to discuss the fee arrangement with anybody else. (Pls.' Ex. 16 at 210, Letter from Barsamian to Kusnell.)

7. We also note that despite Kusnell's belief that the apartments at Alden Park Manor were his property, the rent on these apartments at Alden Park Manor was paid by checks drawn on a bank account in the name of Mascotte Productions, Inc. The only money in this account was the proceeds of the Company's performances in Genoa, Italy, part of which was the property of Shumeikin and Kershentsev. (11/6/91 Tr. at 112–13, Kusnell Direct.)

after Robb resigned from his role in Mascotte, telling Robb that the dancers had no right to see him, that he had no right to visit them, and that he was going to "call the police and have [Robb] arrested. These people are foreigners, you're not allowed to see them." (11/5/91 Tr. at 141, Robb Direct.)

44. As the tensions between Defendants and Pisarev and Kershentsev grew, Kusnell tried to lure members of the Company away to work for him. As early as June, Helen Pozigun, the Kershentsev's translator and assistant, was taking orders from Kusnell instead of Kershentsev. By September, Kusnell was discussing forming his own company with any dancers who wanted to go with him instead of staying with Pisarev, telling the dancers that if Pisarev disobeyed Kusnell the troupe would fall apart, and if the dancers didn't join Kusnell their visas would be revoked and they would be sent back to the Soviet Union. He told the dancers that the troupe owed him $600,000, including $100,000 for their visas. (11/9/91 Tr. at 8–9, Sharova Direct.)

45. Further evidence of Defendants' intent to disrupt Pisarev's control of the Company is the repeated assertions of Carl Kusnell and Gary Green during the summer of 1991 that they "own this ballet company.," (11/6/91 Tr. at 16, Robb Cross,) and Alexander Greenspan's representations to visiting Russian officials that the Company belonged to him. (11/5/91 Tr. at 37, Pisarev Redirect.)

46. These activities in which Kusnell engaged are not "services customarily performed by an Agent." Plaintiffs' evidence showed that agents for classical musicians and dancers do not customarily interfere in the artistic judgment or day to day management of the company. (11/5/91 Tr. at 129, Robb Direct.) Rather, they usually devote their primary efforts to finding bookings and engagements, preparing promotional materials and providing public relations services. (*Id.* at 117.)

### Failure to use Reasonable Efforts to Obtain Bookings

47. Carl Kusnell had no idea how to obtain work for a classical ballet company, and he refused to follow the advice of the only person involved with Mascotte who had any experience in the area, James Robb. Kusnell tried to arrange performances in high capacity stadiums, rather than theaters with the requisite type of stage and lighting. (11/5/91 Tr. at 121, Robb Direct.) Even when he considered a standard theater, he insisted that the Company put on performances only in high capacity theaters like the Mann Music Center in Philadelphia, which requires an enormous amount of publicity in order to make a profit. He ignored the dancers' protestations that the Company had no money to promote and stage such an expensive production. (11/9/91 Tr. at 14, Sharova Direct.) Kusnell never secured any money-making performances for Pisarev or the Company. He didn't even line up a *Nutcracker* performance for them, although the *Nutcracker* is inevitably the biggest profit-maker of any ballet company's yearly schedule. *Id.* at 109.

48. Not only did Kusnell fail to procure any paying engagements for Pisarev and the Company, he terminated two lucrative contracts which Pisarev had already made before coming to the United States in the spring of 1991. Under the agreements between Baci Management, Inc. and the Donetsk Ballet Company, (Pls.' Ex. 1 and 2) the Company could have made up to $288,000 for two tours, one in the spring and one in the winter of 1991, and gained significant exposure to American audiences. Kusnell turned the Company's friendly relationship with Nicholas Litrenta, president of Baci Management and a good source of future engagements, into a hostile one by threatening him and trying to intimidate him, and received only $15,000 from Litrenta for the Company. (11/5/91 Tr. at 130–32, Robb Direct.)

49. Carl Kusnell never prepared any professional-quality promotional materials for Pisarev or the Company. The only literature he had printed was a brochure full of inaccuracies and misspellings. (11/5/91 Tr. at 125, Robb Direct.)

*Failure to Complete Corporate Formalities for Mascotte*

50. Kusnell has acted since May 1, 1991 as the president of Mascotte, but it is evident from the testimony and exhibits at trial that he was never appointed by a board of directors. Defendants filed articles of incorporation for Mascotte Productions, Inc., but never took any further steps in establishing the corporation. No Board of Directors was constituted and no first meeting of incorporators or directors was held. In fact, the shares in Mascotte were never formally issued, or even allocated, and Defendants admit that they were waiting to determine the effect of Soviet law on their arrangement before doing that. There was no vote about who would be the president of Mascotte, rather, somebody asked Kusnell if he wanted to be president, and he agreed. In Carl Kusnell's own words, it was a fluid situation. (11/6/91 Tr. at 59–62, 86–89 Kusnell Direct.)

51. While Defendants claim that the handwritten notes reproduced in Defendants' Exhibit 7, entitled "Memo of Shares," was produced at one of the first two meetings of the parties and was meant to be an allocation, Vadim Pisarev did not know that he was supposed to be the owner of 200 shares, as the memo states, James Robb had no idea that he was supposed to have an interest in the corporation, and Carl Kusnell admits that the allocation of shares was meant to be compensation for services rendered to Mascotte, and would depend on who worked and what new people needed to be brought into the venture. (11/4/91 Tr. at 77, Pisarev Direct; 11/5/91 Tr. at 115–16, Robb Direct; 11/6/91 Tr. at 86–88, Kusnell Direct.) Pisarev's translator at the meetings at which share allocation was allegedly discussed, Helen Pozi-

gun, never translated any discussion of share allocation to Pisarev. (11/8/91 Tr. at 166, Pozigun Cross.) Gary Green, who now claims that he owns no shares, told James Robb that he owned 50% of Mascotte's stock and controlled the company. (11/5/91 Tr. at 115, Robb Direct.)

*Plaintiffs' Current Financial Situation*

52. As of the week of the hearing, November 4–9, 1991, Plaintiffs had not had a money-making performance in months and their financial situation was desperate. They were living on donations from sympathetic Americans like James Robb and a small amount of money that Vadim Pisarev had accumulated in a savings account.

53. Carl Kusnell has ceased all attempts to find bookings for the Company, claiming that he couldn't negotiate with others while he was having a dispute with Plaintiffs because Plaintiffs might refuse to carry out any performance contract he procured. (11/6/91 Tr. at 78, Kusnell Direct.) Defendants have interfered in the past with Plaintiffs' efforts to book engagements for themselves by warning potential venues that the venues may be liable for allowing Plaintiffs' to dance in violation of Defendants' exclusive contracts. Absent a court order to the contrary, Defendants will probably interfere in the future with Plaintiffs' efforts to find work.

## CONCLUSIONS OF LAW

■ 1. This court has jurisdiction over this matter under 28 U.S.C. § 1332, because all plaintiffs are citizens of the U.S.S.R. and all defendants are citizens of the either Pennsylvania or Ohio and the amount in controversy exceeds $50,000.[8]

---

8. We note that Plaintiffs do not allege the requisite citizenship of the parties in either their original complaint or in their amended complaint, alleging rather the residences of all parties who are natural persons. Residence is not synonymous with citizenship, and only diversity of citizenship, not diversity of residence, will confer jurisdiction on a federal court. *Whitelock v. Leatherman*, 460 F.2d 507, 514 (10th Cir.1972). Since we find as a matter of fact that there is diversity of citizenship under section 1332, in that all plaintiffs are citizens of the U.S.S.R., and all defendants are citizens of either Ohio or Pennsylvania, we will treat the complaint as amended to conform to the proof at the November 4–9 hearing. *See Kelleam v. Maryland Casualty Co.*, 112 F.2d 940, 943 (10th Cir.1940), rev'd on other grounds, 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899 (1941).

2. The law of Pennsylvania provides the rules of decision in this case, as stipulated by the parties. (11/9/91 Tr. at 33).

■ 3. Plaintiffs set out three separate arguments for relieving them of any contractual duties to Defendants. First, they argue that Mascotte Productions, Inc. was never properly incorporated, and so could not make a contract with plaintiffs. Second, they argue that the written Booking and Agent Agreements were induced by fraudulent misrepresentations by Defendants. Third, they argue that even if any contracts were formed, they were materially breached by Defendants. For the reasons set out below, we agree with Plaintiffs' third contention—any contracts between Plaintiffs and Defendants relating to representing Plaintiffs in any capacity, whether as agent or booking agent, have been materially breached by Defendants. We will not reach the issue of fraudulent misrepresentation because it is not necessary to do so in order to grant the equitable relief which is the subject of this decision.[9] The clear evidence of Defendants' breach is sufficient to discharge plaintiffs of any liability to defendants under the purported contracts, and to deny Defendants' request that this Court order Plaintiff Vadim Pisarev to perform what they contend are his duties under the purported contracts. In the first section of this discussion, we set out the grounds for finding material breach, and in the next section we will discuss the basis for ordering Defendants Kusnell and Green to restore to Plaintiffs $10,000 held in trust on their behalf.

4. Under Pennsylvania law,

When performance of a duty under a contract was due, any nonperformance is a breach.... If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract.... In determining whether a failure of performance is material, we consider the following factors:

 a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

 b) the extent to which the injured party can be adequately compensated for that part of that benefit of which he will be deprived;

 c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

 d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

 e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

*Oak Ridge Construction Co. v. Tolley,* 351 Pa.Super. 32, 504 A.2d 1343, 1348 (1985) (citing Restatement (Second) of Contracts § 235(2), 237 and 241); *see also Tyro Industries, Inc. v. Trevose Construction Co., Inc.,* 737 F.Supp. 856, 865 (E.D.Pa.1990).

■ 5. If the contracts expressed in the Booking and Agent Agreements were properly formed—if no fraudulent misrepresentations caused Vadim Pisarev to sign the documents, and if Mascotte was capable of making a contract, and if Carl Kusnell was capable of acting as Mascotte's agent in making the contract, then we must find Mascotte had certain duties under the contracts. We must infer as a condition of those contracts that Mascotte, as an agent, had a duty to safeguard its' principal's property and make a proper accounting for that property. *See* Restatement (Second) of Agency §§ 13, 382.[10] The facts demon-

---

**9.** The expedited hearing held the week of November 4th was agreed to be for the purpose of deciding the issues relating to the parties' requests for equitable relief. Neither side has indicated in their closings or otherwise an intention to pursue claims for damages for breach of contract in this action, and, considering the evidence presented at the hearing, it seems unlikely that any such damages could be proven with any degree of certainty. Not only the amount, but the very existence of breach of contract damages appears quite speculative.

**10.** Restatement Section 13 states: "An agent is a fiduciary with respect to matters within the scope of his agency." Section 382 states: "Unless otherwise agreed, an agent is subject to a duty to keep, and render to his principal, an

strate that Mascotte breached that duty by its president Kusnell's failure to keep adequate records, refusal to render a proper accounting, and repeated lying about the amounts he was expending on his principals' behalf.

Kusnell also had a duty to follow his principal's instructions, especially with regard to matters relating to the artistic control of any productions and relating to the dance company's internal structure. *See* Restatement (Second) of Agency § 14, "A principal has the right to control the conduct of the agent with respect to matters entrusted to him." Instead of following Pisarev's wishes, Kusnell tried to control Pisarev and the Company, to the point where the fifty year old Company was ready to fall apart. This conduct completely deprived Pisarev and the Company of the essential benefit they were seeking to derive from their relationship with Defendants, and, if allowed to continue, would result in disaster for the Company's reputation and future contract negotiations.

6. Under the Pennsylvania Associations Code, the filing of articles of incorporation with the Department of State begins the existence of a corporation. 15 Pa.Cons. Stat.Ann. § 1309. The Code also requires, however an organization meeting of the initial directors, or, if the directors are not named in the articles, the incorporators. The directors of the corporation are supposed to be elected at this meeting, and all powers of the corporation are supposed to be exercised under the management of this board of directors, including the power to appoint officers of the corporation and enter into contracts. §§ 1309, 1502, 1721. Because articles of incorporation were filed, Mascotte is a valid corporation, but no board of directors was ever elected to carry out Mascotte's powers, despite the parties' agreement at their first two meet-

ings in April and May that these formalities would be carried out.

■ 7. Defendants' failure to carry out the parties' intention to formalize Mascotte's existence and to issue shares was a material breach of any agreements between Plaintiffs and Defendants. It was essential to the contracts as Defendants would have the court construe them that Pisarev was an owner of Mascotte, and that this ownership was both the reason for the unusually high commission rate of 35% and an excuse for Mascotte's refusal to obey Pisarev's instructions. Pisarev could not realize the benefit of this arrangement if he was never issued any shares of Mascotte or given an opportunity to vote for a board of directors.

■ 8. Part of the parties' understanding in their initial negotiations was that Defendants would find someone with sufficient expertise and contacts in the ballet world to secure bookings for Pisarev and the Company. Defendants never did that, and never managed to secure a single money-making performance for Plaintiffs. The only engagements for the Company between May and the week of the hearing were the concerts in Jackson and Genoa which Plaintiffs arranged for themselves before becoming involved with Mascotte, a free concert at LaSalle University put on to impress Alexander Greenspan's business associates visiting from Russia, and a concert in October arranged by James Robb which Defendants tried to prevent. The only individuals who ever tried to fulfill Mascotte's duties to find bookings were Carl Kusnell and James Robb. Robb left the venture in August due to conflicts with Kusnell, including Kusnell's refusal to take his advice in artistic matters. Kusnell knows nothing about ballet and has no experience booking engagements in arts or entertainment.[11]

account of money or other things which he has received or paid out on behalf of the principal." The Restatement's articulation of these basic principals of agency law would be recognized by the courts of Pennsylvania. *See Dubern v. Girard Trust Bank,* 454 F.2d 565, 570 (3d Cir. 1972); *Pearl Assurance Co. v. National Ins. Agency,* 151 Pa.Super. 146, 30 A.2d 333 (1943).

11. We also note that Kusnell claims he is so busy running his other business concerns that he could not even comply with a reasonable discovery subpoena in this lawsuit. (11/8/91 Tr. at 241–242, Kusnell Cross.) It is difficult to see how he would be able to find the time to act as Plaintiffs' booking agent.

■ 9. In addition to discharging them of any contract liability and freeing them to pursue their own negotiations, Plaintiffs ask the court to exercise its equity powers to order Defendants to return to Plaintiffs any money they hold which belongs to Plaintiffs and has not been properly expended on their behalf. It is a basic tenet of agency law that an agent may be compelled to return to his principal any amounts held for the principal when the agent either

> intentionally or negligently destroys it or causes its loss; ... unreasonably refuses to surrender it on demand; ... [or] makes delivery of it to a person to whom he is not authorized to deliver it;

Restatement (Second) of Agency § 399, 402. *See also Dubern v. Girard Trust Bank,* 454 F.2d at 570, n. 3.

■ 10. Plaintiffs have shown by a preponderance of the evidence that Defendants Kusnell and Green have misplaced $10,000 from Plaintiffs' Jackson, Mississippi performance, and that Kusnell and Green were acting as Plaintiffs' agents in receiving those and other funds and expending them on Plaintiffs' behalf. We were persuaded by the testimony of Alexander Kershentsev and Vadim Pisarev that they never received that money, and we are also convinced that James Robb has no knowledge of its' whereabouts. Even if we were inclined to believe that the $10,000 was delivered to James Robb in an envelope at Sidkoff's offices, we would still be compelled to find that Defendants delivered Plaintiffs' money to a third party without authorization from the owners of the money and failed to obtain any receipt acknowledging delivery, and so breached their fiduciary duty in that way. Accordingly, we will order Kusnell and Green to return that $10,000 to Plaintiffs.

11. Plaintiffs have not sufficiently demonstrated Defendants' breach of their fiduciary duty in the disbursement of the rest of the money entrusted to Defendants. Counsel agreed at the conclusion of the hearing on this matter that, aside from the $10,000 discussed above, approximately $4000 is still in dispute, and requested an accounting for that money. Since we are convinced that Defendants are unable to produce any further documentation regarding the disbursement of those funds, and because we are satisfied from Defendants' evidence that the money was most likely properly expended on Plaintiffs' behalf, we will not order a further accounting for those funds.

■ 12. In order to issue an injunction, the court must find both that irreparable injury will occur without the injunction and that plaintiffs have no adequate remedy at law, and the court must balance the competing claims of injury and the public interest. *Public Interest Research Group, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 82 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.,* 906 F.2d 934, 941 (3d Cir.1990). As stated in the findings of fact, unless this court terminates all contractual duties Plaintiffs may owe Defendants, Plaintiffs will be unable to work in this country and the Donetsk Ballet Company will disintegrate, its members dispersing throughout the world. Time is of the essence because the most active season of the year for a ballet company is fast approaching, and the Company must procure a venue to perform the *Nutcracker* if it is to survive in the coming year. A claim for breach of contract damages will not help preserve the Company because the members will be forced to find other work before such a claim could be recovered.

13. Under the circumstances, equity requires that the court order that Plaintiffs are discharged from all contractual duties to Defendants and that Defendants refrain from interfering in Plaintiffs' lives and contract negotiations in the future. An appropriate order follows.